126 T.C. No. 6

UNITED STATES TAX COURT

SWALLOWS HOLDING, LTD., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8045-02.                    Filed January 26, 2006.

       P is a foreign corporation whose only substantial
asset is unimproved land in the United States.  On its
1994, 1995, and 1996 Federal income tax returns, P
recognized rent and option income and claimed
deductions for taxes and licenses, the result of which
was a reported loss for each year.  P filed each return
after its due date, but before any contact from R.  R
determined that sec. 882(c)(2), I.R.C., precluded P
from deducting its expenses because it filed its
returns untimely.  In Anglo-Am. Direct Tea Trading Co.
v. Commissioner, 38 B.T.A. 711 (1938), a setting
similar to that here, the Board held that sec. 233 of
the Revenue Act of 1928, ch. 852, 45 Stat. 849, and the
Revenue Act of 1932, ch. 209, 47 Stat. 230, an almost
verbatim predecessor to sec. 882(c)(2), I.R.C., did not
include a timely filing requirement and rejected R's
contrary interpretation.  Subsequently, the Court of
Appeals for the Fourth Circuit construed like
predecessor text similarly, also in rejection of R's
contrary interpretation.  See Blenheim Co. v.

<u>Commissioner</u>, 125 F.2d 906 (4th Cir. 1942), affg. 42 B.T.A. 1248 (1940); <u>Ardbern Co. v. Commissioner</u>, 120 F.2d 424 (4th Cir. 1941), modifying and remanding on other grounds 41 B.T.A. 910 (1940).  R continues to adhere to his rejected interpretation and now attempts to support that interpretation by citing Treasury regulations issued in 1990.  Those regulations interpret sec. 882(c)(2), I.R.C., to provide that a foreign corporation generally is entitled to deduct its expenses only if it files a timely return.

 <u>Held</u>:  A timely filing requirement is not found in a plain reading of sec. 882(c)(2), I.R.C.

 <u>Held</u>, <u>further</u>, the timely filing requirement in the regulations is invalid in that it is unreasonable under a plain reading of sec. 882(c)(2), I.R.C., and an application of the considerations set forth in <u>Natl. Muffler Dealers Association v. United States</u>, 440 U.S. 472 (1979).

<u>Phillip L. Jelsma</u>, for petitioner.

<u>Thomas A. Dombrowski</u> and <u>Nina E. Chowdhry</u>, for respondent.

LARO, <u>Judge</u>:  Petitioner petitioned the Court to redetermine respondent's determination of deficiencies in its Federal income taxes for its taxable years ended May 31, 1994, 1995, and 1996 (1994, 1995, and 1996 taxable years, respectively; collectively, subject years), and additions thereto under section 6651(a)(1).[1]  The deficiencies and additions to tax are as follows:

---

[1] Unless otherwise noted, section references are to the applicable versions of the Internal Revenue Code of 1986.  Rule references are to the Tax Court Rules of Practice and Procedure.

|                  |            | Addition to tax |
| Taxable Year     | Deficiency | Sec. 6651(a)(1) |
| ---------------- | ---------- | --------------- |
| 1994             | $7,200     | $1,800.00       |
| 1995             | 5,850      | 1,462.50        |
| 1996             | 1,800      | 450.00          |

We decide whether petitioner may deduct the ordinary and necessary expenses it incurred during the subject years. The expenses relate to income treated as effectively connected to the conduct of a trade or business in the United States (effectively connected income), and petitioner claimed the expenses on its Federal income tax returns, which it filed before any contact from respondent. Respondent determined in the notice of deficiency that section 882(c)(2) precludes petitioner from deducting its expenses because it did not file its returns timely. Respondent concedes that the expenses are deductible if section 882(c)(2) does not include a timely filing requirement.

In Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), the Board of Tax Appeals (Board) held that section 233 of the the Revenue Act of 1928, ch. 852, 45 Stat. 849, and the Revenue Act of 1932, ch. 209, 47 Stat. 230, an almost verbatim predecessor to section 882(c)(2), did not include a timely filing requirement.[2]  In so holding, the Board construed

---

[2] As will be discussed, the relevant text of sec. 882(c)(2), "in the manner prescribed in subtitle F", is substantially the same as the related text of the predecessors to sec. 882(c)(2). We refer interchangeably to the relevant text of sec. 882(c)(2) and the related text of its predecessors as the relevant text.

the earlier section's requirement that a foreign corporation file a true and accurate return "in the manner prescribed in this title" and rejected respondent's argument that the word "manner", as it appeared in the quoted text, meant that the foreign corporation could deduct its expenses only if it filed its returns timely; i.e., before the time set forth in a predecessor to section 6072.[3]  Subsequently, the Court of Appeals for the Fourth Circuit in Ardbern Co. v. Commissioner, 120 F.2d 424 (4th Cir. 1941), modifying and remanding on other grounds 41 B.T.A. 910 (1940), quoted and applied the Anglo-Am. Direct Tea Trading Co. holding favorably and without reservation.  The Court of Appeals for the Fourth Circuit in Blenheim Co. v. Commissioner, 125 F.2d 906 (4th Cir. 1942), affg. 42 B.T.A. 1248 (1940), also acknowledged the Anglo-Am. Direct Tea Trading Co. holding, construed the relevant text not to contain any reference to time, and stated that Congress had enacted the relevant text in 1928 intending to allow a foreign corporation to deduct its expenses upon its filing of a tax return.

In 1990, the Secretary issued section 1.882-4(a)(2) and (3)(i), Income Tax Regs. (disputed regulations).  The disputed regulations interpret section 882(c)(2) to provide that a foreign corporation generally is entitled to deduct its expenses only if

---

[3] Sec. 6072, entitled "Time For Filing Income Tax Returns", provides dates by which an income tax return must be filed in order to be timely.

it files a timely return. Under the relevant part of the
disputed regulations, a return is timely if it is filed before an
arbitrary 18-month deadline (18-month deadline) devised by the
Secretary.[4] The Secretary issued the disputed regulations
stating that section 882(c)(2) contains a "clear" requirement
that a foreign corporation file its return timely in order to
deduct its expenses. The Secretary made no mention of the
consistent interpretation of the relevant text by the Court of

---

[4] The regulations explain the 18-month deadline as follows:

For taxable years of a foreign corporation ending after
July 31, 1990, whether a return for the current taxable
year has been filed on a timely basis is dependent upon
whether the foreign corporation filed a return for the
taxable year immediately preceding the current taxable
year. If a return was filed for that immediately
preceding taxable year, or if the current taxable year
is the first taxable year of the foreign corporation
for which a return is required to be filed, the
required return for the current taxable year must be
filed within 18 months of the due date as set forth in
section 6072 and the regulations under that section,
for filing the return for the current taxable year. If
no return for the taxable year immediately preceding
the current taxable year has been filed, the required
return for the current taxable year (other than the
first taxable year of the foreign corporation for which
a return is required to be filed) must have been filed
no later than the earlier of the date which is 18
months after the due date, as set forth in section
6072, for filing the return for the current taxable
year or the date the Internal Revenue Service mails a
notice to the foreign corporation advising the
corporation that the current year tax return has not
been filed and that no deductions (other than that
allowed under section 170) or credits (other than those
allowed under sections 33, 34 and 852(b)(3)(D)(ii)) may
be claimed by the taxpayer. [Sec. 1.882-4(a)(3)(i),
Income Tax Regs.]

Appeals for the Fourth Circuit and the Board not to include any timely filing requirement.

Petitioner argues that section 882(c)(2) does not contain a timely filing requirement and that the disputed regulations are invalid as inconsistent with that section.[5]  Respondent argues that section 882(c)(2) provides clearly that a foreign corporation must file its return timely in order to deduct its expenses and that the disputed regulations are a proper interpretation of that provision.  Respondent asks the Court now to accept his interpretation, which he acknowledges is the same as that rejected in Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra, and its progeny, and to disavow all contrary interpretations expressed by the Court of Appeals for the Fourth Circuit and the Board.

We agree with petitioner that section 882(c)(2) does not contain a timely filing requirement and that the disputed regulations are invalid to the extent discussed herein.  We hold that petitioner may deduct its expenses.  On the basis of our holding and a concession by respondent that section 6651(a) is inapplicable if petitioner is entitled to deduct its expenses, we also hold without further discussion that petitioner is not

---

[5] Petitioner also makes numerous other arguments which are pertinent only if the disputed regulations are valid.  Given our holding herein that the disputed regulations are invalid, we need not and do not decide any of petitioner's other arguments.

liable for any addition to tax determined by respondent under section 6651(a).

## FINDINGS OF FACT

Many facts were stipulated and are found accordingly. We incorporate herein by this reference the stipulated facts and the exhibits submitted therewith.

### I. Background

Petitioner is a Barbados corporation whose mailing address was in Bridgetown, Barbados, when its petition was filed with the Court. It is an accrual method taxpayer that for Federal income tax purposes files a Form 1120-F, U.S. Income Tax Return of a Foreign Corporation (Form 1120-F), on the basis of a fiscal year ending on May 31. Its sole activity during the subject years was owning 160 acres of unimproved real estate (U.S. real estate) in San Diego County, California, and receiving option and rental income from the U.S. real estate. Petitioner has never engaged in a trade or business in the United States, and it does not have a separate business activity in Barbados.

### II. Petitioner's Formation and Issuance of Additional Shares

Raimundo Arnaiz-Rosas (Rosas) is a citizen and resident of Mexico. He acquired the U.S. real estate on December 30, 1986. In June 1991, he formed petitioner as his wholly owned corporation. He transferred the U.S. real estate to petitioner on November 21, 1991.

Aurora Elsa Arnaiz (Arnaiz) is the sister of Rosas. She is a citizen and resident of Mexico. On June 1, 1992, petitioner issued additional shares of its stock to Arnaiz. Afterwards, Arnaiz owned 52 percent of petitioner's stock, and Rosas owned the remaining 48 percent.

III. Petitioner's Initial Tax Return

On September 14, 1992, petitioner filed a Form 1120-F with respondent's service center in Philadelphia, Pennsylvania (Philadelphia Service Center), for its short taxable year from June 27, 1991, through May 31, 1992 (1992 taxable year). The return (petitioner's initial return) was petitioner's first Federal income tax return. That return was prepared by Francisco A.F. Cervantes (Cervantes), petitioner's tax adviser and certified public accountant in California. As to petitioner's 1992 taxable year, petitioner's initial return reported that petitioner had no income or expense, that it had not engaged in a trade or business in the United States, and that it had no effectively connected income. Petitioner's initial return also reported that petitioner's business activity was real estate and that its product or service was investment. Petitioner's initial return also reported that petitioner was incorporated in Barbados and that petitioner was subject to income tax under the laws of Barbados.

IV. <u>U.S. Real Estate</u>

The U.S. real estate has been vacant land throughout the subject years.  During the subject years, an apparently unrelated entity leased from petitioner approximately 10 acres of the U.S. real estate for use as a skydiving landing zone.  Pursuant to the lease agreements, the lessee was responsible for maintenance costs, utilities, license fees, personal property taxes, and other costs associated with its use of the leased property. Between March 16, 1993, and April 1, 1996, another apparently unrelated entity held an option to purchase a portion of the U.S. real estate.

During the respective subject years, petitioner realized rental income of $12,000, $18,000, and $12,000 as to the lease and $36,000, $21,000, and zero dollars as to the option.  During the same respective years, petitioner incurred expenses totaling $77,059, $62,418, and $40,041 for real property taxes payable to the County of San Diego, franchise taxes payable to the State of California, and other fees.

V. <u>Petitioner's Tax Returns Other Than the Initial Return</u>

On July 23, 1999, petitioner filed with the Philadelphia Service Center a Form 1120-F for its taxable year ended May 31, 1993 (1993 taxable year).  Also on that date, petitioner voluntarily (before any contact from respondent) filed with the Philadelphia Service Center a Form 1120-F for each of the subject

years (collectively, subject returns). Cervantes first advised petitioner in 1999 that it had to file the four returns, and Cervantes prepared those returns shortly after giving this advice.[6] Petitioner had no communications with Cervantes as of the time of this advice going back to the earlier time at which petitioner's initial return was filed. When the four returns were filed, respondent had no knowledge that the returns were overdue.

The four returns filed in 1999 each listed petitioner's U.S. employer identification number and reported that petitioner was incorporated in Barbados, that petitioner was subject to income tax under the laws of Barbados, and that petitioner was not liable for a United States branch profits tax. Each return also reported that petitioner's business activity was real estate and that its product or service was investment. Each return also reported that petitioner had not engaged in a trade or business in the United States, but that petitioner had realized a taxable loss effectively connected with the conduct of a trade or business in the United States. None of the returns included a statement under section 1.871-10(d)(1)(ii), Income Tax Regs., reporting that petitioner was making an election under section 882(d)(1). Because respondent with petitioner's acquiescence has

---

[6] Cervantes also prepared petitioner's Federal income tax returns for several years following the subject years.

treated the subject returns as such an election, petitioner's income from the U.S. real estate for the subject years is treated as effectively connected income.

On its Form 1120-F for its 1993 taxable year, petitioner recognized option income of $16,290 and deducted an expense for taxes of $52,081, resulting in a reported taxable loss of $35,791. On the respective subject returns, petitioner recognized rental income of $12,000, $18,000, and $12,000 and option income of $36,000, $21,000, and zero dollars. Petitioner also on the respective subject returns deducted expenses for taxes and licenses in the total amounts of $77,059, $62,418, and $40,041, resulting in reported losses (without consideration of any net operating loss (NOL) carryforward) of $29,059, $23,418, and $28,041. Petitioner reported on its Form 1120-F for its 1994 taxable year that it had available as an NOL carryover its prior year's loss of $35,791. Petitioner reported on its Form 1120-F for its 1995 taxable year that it had available as an NOL carryover its prior years' losses totaling $64,850 ($29,059 + $35,791). Petitioner reported on its Form 1120-F for its 1996 taxable year that it had available as an NOL carryover its prior years' losses totaling $88,268 ($23,418 + $29,059 + $35,791).

## VI.  Respondent's Determination

On January 31, 2002, respondent issued the notice of deficiency to petitioner for the subject years.[7]  Respondent determined the deficiencies shown therein by disallowing all of the deductions claimed on the subject returns and applying the corporate income tax rates of section 11 to petitioner's gross income, as reported.  Respondent disallowed the deductions because none of the returns was filed timely.

OPINION

## I.  Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers generally bear the burden of proving those determinations wrong.  See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In certain cases, section 7491(a) places the burden of proof upon the Commissioner.  Given the manner in which we decide this case, we need not and do not decide which party bears the burden of proof in this case.

## II.  Parties' Arguments

The parties disagree on the section 882(c)(2) requirements which serve as a prerequisite to a foreign corporation's deducting its expenses.  Petitioner argues that it meets those

---

[7] Neither party has explained why the notice of deficiency does not address petitioner's 1993 taxable year.

requirements in that it filed true and accurate Federal income tax returns.  According to petitioner, section 882(c)(2) does not require that the subject returns be filed timely, and the disputed regulations are invalid to the extent they impose such a requirement.  Respondent argues that section 882(c)(2) includes a clear timely filing requirement and that the disputed regulations are a valid construction of that requirement.  According to respondent, petitioner may not deduct its expenses because it did not file the subject returns timely.

We agree with petitioner.  To best understand our decision, we first discuss the relevant provisions and developments in the law which preceded the issuance of the disputed regulations.  We then address our interpretation of the relevant text and the standard by which we judge the disputed regulations to be invalid.

III.  Relevant Filing Requirements

Every corporation subject to Federal income tax must file a Federal income tax return with respect to that tax.  See sec. 6012(a)(2).  The regulations interpret section 6012(a)(2) to require that such a corporation file a Federal income tax return even if it does not have any gross or taxable income for the year.  See sec. 1.6012-2(a)(1), Income Tax Regs.  The regulations interpret section 6012(a)(2) to apply to foreign corporations to the extent set forth in section 1.6012-2(g)(1), Income Tax Regs.

See <u>id.</u> Section 1.6012-2(g)(1), Income Tax Regs., generally requires that a foreign corporation file a Federal income tax return on Form 1120-F if it "is engaged in trade or business in the United States at any time during the taxable year or * * * has income which is subject to taxation under subtitle A of the Code (relating to income taxes)".

Section 6072 sets the time for the filing of Federal income tax returns required by section 6012. A corporation generally must file its return by the 15th day of the third month following the close of its taxable year. See sec. 6072(b); see also sec. 1.6072-2(a), Income Tax Regs. An exception to this rule is found in the case of a foreign corporation without an office or place of business in the United States. In such a case, the foreign corporation may file its tax return up until the 15th day of the sixth month following the close of its taxable year. See sec. 6072(c); see also sec. 1.6072-2(b), Income Tax Regs.

Petitioner did not conduct a trade or business in the United States at any time from its inception through the close of the last subject year. Thus, but for an election under section 882(d)(1), petitioner was required by section 6012(a), as interpreted by section 1.6012-2(a)(1) and (g)(1), Income Tax Regs., to file a Federal income tax return for a taxable year included within that period only if it had income subject to

Federal income tax.[8]  Petitioner had no such income for its first taxable year but did have such income for each of its taxable years thereafter through the close of the last subject year.  For each of the subject years, therefore, petitioner was required to file a Form 1120-F with the Commissioner.  Because petitioner was within the rule of section 6072(c) for each of those years, the due dates of the subject returns were November 15, 1994, 1995, and 1996, respectively.

IV.  Place for Filing Returns

Section 6091(b)(2) sets forth the rules concerning the place where a corporation must file its Federal income tax returns.  That section was enacted as part of the Internal Revenue Code of 1954 (1954 Code), ch. 736, 68A Stat. 752, to replace section 53(b)(2) of the Internal Revenue Code of 1939 (1939 Code), ch. 2, 53 Stat. 28.  Former section 53(b)(2), which also appeared in the Revenue Act of 1928, 45 Stat. 808, and the Revenue Act of 1932, 47 Stat. 189, provided:

> (2) CORPORATIONS.--Returns of corporations shall be made to the collector of the district in which is located the principal place of business or principal office or agency of the corporation, or, if it has no principal place of business or principal office or agency in the United States, then to the collector at Baltimore, Maryland.

---

[8] Petitioner would have been required by sec. 6012(a), as interpreted by sec. 1.6012-2(a)(1) and (g)(1), Income Tax Regs., to file a return for any taxable year in which it had a sec. 882(d)(1) election in effect.  Such an election was in effect as to petitioner only during the subject years.

Thus, before the enactment of the 1954 Code, a foreign corporation such as petitioner was required to file its Federal income tax returns at Baltimore, Maryland.

Since the enactment of the 1954 Code, a corporation generally must file its Federal income tax returns with the District Director for the internal revenue district in which is located the corporation's principal place of business, principal office, or agency. See sec. 6091(b)(2)(A); see also sec. 1.6091-2(b), Income Tax Regs. The rule is different where a foreign corporation has no principal place of business, principal office, or agency in any internal revenue district. See sec. 6091(b)(2)(B)(i), (iii). In that case, section 6091(b)(2)(B)(i) and (iii) allows the Secretary to designate by regulation the place where the foreign corporation's return will be filed.

As relevant here, section 1.6091-3(f), Income Tax Regs. (before amendment on September 15, 2004, by T.D. 9156, 2004-2 C.B. 669, 671), generally required that a foreign corporation file its Federal income tax returns with the "Director of International Operations, Internal Revenue Service, Washington, D.C. 20225, or the district director, or the director of the service center, depending on the appropriate officer designated on the return form or in the instructions issued with respect to such form". That section was issued by the Secretary in 1959. See T.D. 6364, 1959-1 C.B. 546, 604. In the 1972 instructions

for Form 1120-F, the Commissioner directed that "All foreign corporations (whether or not engaged in a trade or business within the U.S.) must file their return with the Internal Revenue Service Center * * * [in] Philadelphia, Pennsylvania 19155". Previously, the instructions for Form 1120-F had stated that "All foreign corporations (whether or not engaged in a trade or business within the United States) must file their return with the "Director of International Operations, Internal Revenue Service Center, Washington, D.C. 20225". See, e.g., the 1971 instructions for Form 1120-F.

The instructions for the subject returns state that taxpayers must file their Forms 1120-F "with the Internal Revenue Service Center, Philadelphia, PA 19255". In accordance with these instructions, petitioner filed the subject returns with the Philadelphia Service Center.[9]

─────────────

[9] Sec. 7482(b)(1)(B) provides rules as to venue for appeal by a corporation without a principal place of business, principal office, or agency in a judicial circuit. In such a case, venue is the United States Court of Appeals for the circuit in which is located "the office to which was made the return of the tax in respect of which the liability arises". Id. Because petitioner filed the subject returns in Philadelphia, Pa., an appeal of this case would appear to be to the Court of Appeals for the Third Circuit. As noted supra pp. 15-16, a foreign corporation such as petitioner was required before the enactment of the 1954 Code to file its Federal income tax returns at Baltimore, Md. Venue for appeal in that case was the Court of Appeals for the Fourth Circuit.

V.   Section 882

   A.   Overview

   A foreign corporation engaged in a trade or business within the United States is taxable under section 11, 55, 59A, or 1201(a) on its taxable income that is effectively connected income, see sec. 882(a)(1); such taxation is consistent with that of a domestic corporation.  A foreign corporation not engaged in a trade or business within the United States is taxable at a flat rate of 30 percent of the amount received from "interest (other than original issue discount as defined in section 1273), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, and income", but only to the extent that the income is received from sources within the United States (U.S. source income).  Sec. 881(a)(1).  A foreign corporation is not taxable in the United States on its income that is neither effectively connected income nor U.S. source income.  See id.

   A foreign corporation that realizes U.S. source income that is not effectively connected income may elect to treat the U.S. source income as effectively connected income if the U.S. source income is derived from real property located in the United States.  See sec. 882(d)(1).  The Commissioner has ruled that a foreign corporation may not make such an election for a taxable

year in which it does not derive income from real property in the United States. See Rev. Rul. 91-7, 1991-1 C.B. 110; see also sec. 1.871-10(a), Income Tax Regs.

For purposes of section 882(a)(1), a foreign corporation generally determines its taxable income by including in its gross income only its effectively connected income. See sec. 882(a)(2). Whether the foreign corporation may claim deductions against its gross income to arrive at taxable income depends on section 882(c)(2). Under that section, a

> foreign corporation shall receive the benefit of the deductions and credits allowed to it in this subtitle only by filing or causing to be filed with the Secretary a true and accurate return, in the manner prescribed in subtitle F, including therein all the information which the Secretary may deem necessary for the calculation of such deductions and credits. * * *

B. History of Relevant Provisions

   1. Predecessors to Section 882(c)(2)

We trace section 882(c)(2) to its origin in section 233 of the Revenue Act of 1928. There, Congress provided:

SEC. 233. ALLOWANCE OF DEDUCTIONS AND CREDITS.

> A foreign corporation shall receive the benefit of the deductions and credits allowed to it in this title only by filing or causing to be filed with the collector a true and accurate return of its total income received from all sources in the United States, in the manner prescribed in this title; including therein all the information which the Commissioner may deem necessary for the calculation of such deductions and credits.

Congress enacted section 233 of the Revenue Act of 1928 in the same form as the related bill had been introduced in the House of Representatives.  See H.R. 1, sec. 233, 70th Cong., 1st Sess. (1927).  The committee reports underlying this enactment do not explain the section's intent or breadth.

Section 233 of the Revenue Act of 1928 was reenacted verbatim in the Revenue Act of 1932, 47 Stat. 230, the Revenue Act of 1934, ch. 277, 48 Stat. 737, the Revenue Act of 1936, ch. 690, 49 Stat. 1717, and the Revenue Act of 1938, ch. 289, 52 Stat. 531.  The same provision also was codified verbatim in the 1939 Code, 53 Stat. 79, except that Congress placed the word "chapter" in the two places where the word "title" had appeared in the previous statute.[10]  Compare section 233 of the 1939 Code with section 233 of the Revenue Act of 1938.

In the 1954 Code, Congress recodified section 233 of the 1939 Code in former section 882(c)(1), 68A Stat. 282, with slight modifications.  Section 882(c)(1) of the 1954 Code provided:

_____

[10] The 1939 Code was approved and published on Feb. 10, 1939.  See 53 Stat. iii.  The 1939 Code "is an enactment without change of the 1939 edition of the Codification of Internal Revenue Laws prepared by * * * the staff of the Joint Committee on Internal Revenue Taxation, with the assistance of the Department of the Treasury and the Department of Justice." 53 Stat. iii.  The underlying bill was introduced in the House Committee on Ways and Means on Jan. 18, 1939.  See 53 Stat. iii.

        (c) Allowance of Deductions and Credits.--

                (1) Deductions allowed only if return
        filed.--A foreign corporation shall receive
        the benefit of the deductions allowed to it
        in this subtitle only by filing or causing to
        be filed with the Secretary or his delegate a
        true and accurate return of its total income
        received from all sources in the United
        States, in the manner prescribed in subtitle
        F, including therein all the information
        which the Secretary or his delegate may deem
        necessary for the calculation of such
        deductions.

The House committee report underlying the 1954 Code stated as to this action:  "Subsection (c), relating to necessity for filing of returns by foreign corporations in order to secure allowance of deductions and credits, is, in substance, identical with sections 232, 233, and 234, 1939 Code."  H. Rept. 1337, 83d Cong., 2d Sess. A246 (1954); see also S. Rept. 1622, 83d Cong., 2d Sess. 417 (1954) (same statement except omits the words "and credits").

        Section 882 of the 1954 Code was next amended in the Foreign Investors Tax Act of 1966, Pub. L. 89-809, sec. 104(b)(1), 80 Stat. 1555.  A stated purpose of that act was "To provide equitable tax treatment for foreign investment in the United States".  Foreign Investors Tax Act of 1966, 80 Stat. 1539.  To that end, Congress renumbered section 882(c)(1) of the 1954 Code with slight modification as section 882(c)(2) and added a new section 882(d).  Foreign Investors Tax Act of 1966, sec.

104(b)(1), 80 Stat. 1556.  As to the first action, the House

committee report stated:

> Deductions and credits allowed only if return filed.
>
> Paragraph (2) of section 882(c) continues the substance of the rule contained in section 882(c)(1) of existing law that a foreign corporation is to receive the benefit of the allowable deductions only by filing a true and accurate return of its total income (including income subject to tax under section 881(a)); a technical amendment has been provided, however, to make clear that the return must also include the income derived from sources without the United States which is effectively connected with the conduct of a trade or business within the United States.  This rule has also been extended to apply to credits against tax, such as the foreign tax credit, other than the credit provided by section 32 for tax withheld at the source or the credit provided by section 39 for certain users of gasoline and lubricating oil.  As so amended, section 882(c)(2) is consistent with section 874(a) of the code, as amended by section 3(d) of the bill.  [H. Rept. 1450, 89th Cong. 2d Sess. 90 (1966).]

As to the addition of section 882(d), the Senate committee report

stated:

> As a general rule, the bill provides that income of a nonresident alien or foreign corporation will be subject to the flat 30-percent (or lower treaty) rate if it is not effectively connected with the conduct of a trade or business within the United States.  The regular individual or corporate rates apply to income which is effectively connected to the conduct of a U.S. trade or business.  However, the foreigner may elect to treat real property income as if it were income effectively connected with a U.S. business.  This is to permit the deductions attributable to this real property income to be deducted from it.  * * *  [S. Rept. 1707, 89th Cong., 2d Sess. 19 (1966), 1966-2 C.B. 1059, 1071.]

Cf. <u>id.</u> at 26, 1966-2 C.B. at 1076-1077, where the Senate

committee noted as to nonresident aliens owning property in the

United States that

> Taxing income on real property at a flat 30-percent
> rate without the allowance of allocable
> deductions--which in the case of this type of income
> may be relatively large--may result in quite heavy tax
> burdens on this type of income.  Your committee agrees
> with the House that the law in this area should be
> clarified and doubts whether the disallowance of
> deductions in such cases is appropriate.  Moreover, the
> disallowance of deductions in such cases would tend to
> discourage foreign investment in U.S. realty.

####    2.    Section 217 of the Revenue Act of 1918

#####        a.    Overview

Ten years before the Revenue Act of 1928, 45 Stat. 791,

Congress enacted in section 217 of the Revenue Act of 1918, ch.

18, 40 Stat. 1069, a provision applicable to nonresident aliens.

This provision was substantially similar to section 233 of the

Revenue Act of 1928, except that section 217 used the words

"nonresident alien individual" rather than the words "foreign

corporation".  Section 217 of the Revenue Act of 1918 provided:

> NONRESIDENT ALIENS--ALLOWANCE OF DEDUCTIONS AND
> CREDITS.
>
>     Sec. 217.  That a nonresident alien individual
> shall receive the benefit of the deductions and credits
> allowed in this title only by filing or causing to be
> filed with the collector a true and accurate return of
> his total income received from all sources corporate or
> otherwise in the United States, in the manner
> prescribed by this title, including therein all the
> information which the Commissioner may deem necessary
> for the calculation of such deductions and credits:
> * * *

Section 217 of the Revenue Act of 1918 was reenacted in subsequent revenue acts, see, e.g., Revenue Act of 1924, ch. 234, sec. 217(g), 43 Stat. 275; Revenue Act of 1926, ch. 27, sec. 217(g), 44 Stat. 32; Revenue Act of 1928, ch. 852, sec. 215(a), 45 Stat. 848; Revenue Act of 1932, ch. 208, sec. 215(a), 47 Stat. 229, and was codified in the 1939 Code as section 215(a), ch. 2, 53 Stat. 77. It was recodified in the 1954 Code as section 874(a), 68A Stat. 281. Section 874 of the 1954 Code was identical in substance with sections 215 and 216 of the 1939 Code, H. Rept. 1337, 83d Cong., 2d Sess., supra at A245, and is virtually identical to section 882(c)(2) except that the latter section uses the words "foreign corporation" instead of the words "nonresident alien individual".

From the outset, the Secretary interpreted section 217 of the Revenue Act of 1918 as providing that a nonresident alien was allowed deductions upon the alien's filing of a true and accurate Federal income tax return and that the alien's tax liability would be assessed without the benefit of deductions if the Commissioner had to prepare a substitute return for the alien. That interpretation was set forth in Article 311 of Regulations 45 as follows:

> Art. 311. Allowance of deductions and credits to nonresident alien individual.--Unless a nonresident alien individual shall render a return of income as required in article 404 [i.e., "a full and accurate return on form 1040 (revised) or form 1040 A (revised) of his income received from sources within the United

States, regardless of amount"], the tax shall be collected on the basis of his gross income (not his net income) from sources within the United States. Where a nonresident alien has various sources of income within the United States, so that from any one source or from all sources combined the amount of income shall call for the assessment of a surtax, and a return of income shall not be filed by him or on his behalf, the Commissioner will cause a return of income to be made and include therein the income of such nonresident alien from all sources concerning which he has information, and he will assess the tax and collect it from one or more of the sources of income within the United States of such nonresident alien, without allowance for deductions or credits. * * *

b. Relationship to Former Section 233

The Court of Appeals for the Fourth Circuit has observed that Article 311 of Regulations 45 contains the Secretary's longstanding construction of section 217 of the Revenue Act of 1918. See Blenheim Co. v. Commissioner, 125 F.2d at 910. That court has stated that Congress is presumed to have included that construction in section 233 as enacted as part of the Revenue Act of 1928 and as later reenacted. See id. (citing Brewster v. Gage, 280 U.S. 327 (1930); Morgan v. Commissioner, 309 U.S. 78 (1940)).

3. Section 235 of the Revenue Act of 1928

Section 235 of the Revenue Act of 1928, 45 Stat. 849, was a predecessor to section 6072 and provided the due date for filing the Federal income tax returns of a foreign corporation without an office or place of business in the United States. Section 235 of the Revenue Act of 1928 provided:

SEC. 235. RETURNS.

> In the case of a foreign corporation not having any office or place of business in the United States the return, in lieu of the time prescribed in section 53(a)(1), shall be made on or before the fifteenth day of the sixth month following the close of the fiscal year, or, if the return is made on the basis of the calendar year then on or before the fifteenth day of June. If any foreign corporation has no office or place of business in the United States but has an agent in the United States, the return shall be made by the agent.

Section 235 of the Revenue Act of 1928 was reenacted verbatim in the Revenue Act of 1932, 47 Stat. 230. Compare section 235 of the Revenue Act of 1932 with section 235 of the Revenue Act of 1928.

VI. Relevant Caselaw

A. Overview

This Court has observed that sections 874(a) and 882(c)(2), because similar in text and legislative intent, are to be interpreted in pari materia. See Espinosa v. Commissioner, 107 T.C. 146, 152 (1996). The Court has also observed that few opinions discuss the text of these sections in the context of Federal income tax returns submitted to the Commissioner untimely.[11] Id. at 152-153. All of the cases discussing the

---

[11] The paucity of cases is not surprising. Before the enactment of the 1954 Code, all cases interpreting the predecessors of sec. 882(c)(2) were appealable to the Court of Appeals for the Fourth Circuit. See supra note 9. As will be discussed, the view of that court was set forth by the end of 1942 in three opinions. In addition, as also will be discussed,

(continued...)

relevant text are in the setting of former section 233.  Only one case discusses the text of section 874(a), and no case discusses the predecessors of that section.

B.  Anglo-Am. Direct Tea Trading Co.

In the seminal case of Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), the taxpayer was a foreign corporation with no offices or agents in the United States, and it did not transact any business in the United States.  During its taxable years ended November 30, 1932 and 1933, the taxpayer received gross income in the form of dividends from a wholly owned domestic corporation.  In March 1935, the Commissioner learned of the dividends, determined that the taxpayer had not filed Federal income tax returns for its taxable years of receipt, and discussed this matter with one of the taxpayer's officers.  On or about April 15, 1935, without informing the taxpayer that he was doing so, the Commissioner's revenue agent prepared substitute Federal income tax returns for those taxable years of receipt.  Before the substitute returns were accepted by the Commissioner, the taxpayer on April 18, 1935, filed delinquent Federal income tax returns that included the dividends in its gross income and claimed corresponding deductions for

---

[11](...continued)
the Secretary's regulations construing the relevant text did not state until 1990 that a timely filed return was required as a condition to a foreign corporation's deducting its expenses.

dividends received.  The Commissioner denied the deductions reported on those returns.

Section 23 of the Revenue Act of 1928, 45 Stat. 799, and the Revenue Act of 1932, 47 Stat. 179, allowed the taxpayer to deduct from its gross income any dividend received from a domestic corporation.  The Commissioner argued that notwithstanding this law, the phrase in section 233 of the 1928 and 1932 Revenue Acts that conditioned the allowance of deductions on the filing of returns "in the manner prescribed in this title" meant that deductions were allowable to a foreign corporation only if it filed its return before the time specified in section 235 of the 1928 and 1932 Revenue Acts.  Under section 235 of the 1928 and 1932 Revenue Acts, the taxpayer's returns had to be filed by May 30, 1933 and 1934, respectively, in order to be timely.  The Commissioner argued more specifically that Congress intended that the word "manner" be construed broadly as including a timeliness requirement or, in other words, a reference to the timely filing requirements found elsewhere in the applicable revenue acts.

The Board, in a reviewed opinion with no recorded dissent, disagreed with the Coommissioner's interpretation of the relevant text and held that the taxpayer was entitled to its deductions even though its returns had been filed untimely.  See Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra at 716.  The Board reached this holding by carefully examining Congress's use in the

revenue acts of the words "manner" and "time" and by literally applying the word "manner" in accordance with the word's "usual and ordinary meaning of 'mode, method, mien, style, or way'". Id. at 715. The Board concluded that the word "manner" was not intended by Congress to, and thus did not, include any element of time, let alone impose a requirement that a foreign corporation file its return by a certain date in order to deduct its expenses. Id. at 714-716. The Board stated: "A careful reading of sections 233 and 235 discloses no indication of a legislative intent to extend the meaning of 'manner' so as to include 'time'. Neither section provides that the deductions may not be allowed unless the return is filed within the time prescribed." Id. at 715. The Board added that if Congress had intended to deprive a foreign corporation of its right to a deduction when it did not file a timely Federal income tax return, it would have said so. Id. The Board also supported its conclusion by analyzing the "structure" of the revenue acts. The Board concluded from that analysis:

> They seem to have a more or less common pattern. Thus section 52 governs the manner of filing corporation returns, section 215(a) deals with the manner of filing returns by or for nonresident aliens, section 251(f) the manner of filing returns by citizens of the United States who are in receipt of income from sources within possessions of the United States, and section 233 the manner of filing returns for a foreign corporation. Sections 53, 217, and 235 deal with the time and place of filing returns, while sections 56, 218, and 236 deal with payment. Inasmuch as separate sections deal with "manner" and "time", we think it highly improbable that

Congress ever intended to include the element of time in the section dealing primarily with the manner of filing. * * * [Id. at 715-716.]

C.  Mills, Spence & Co.

In Mills, Spence & Co. v. Commissioner, a Memorandum Opinion of the Board of Tax Appeals dated Oct. 5, 1938, the Board followed its decision in Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra.  In Mills, Spence & Co., the taxpayer was a foreign corporation that had no offices in the United States but derived income from sources within the United States, thus requiring it to file Federal income tax returns.  On July 19, 1934, the Commissioner informed the taxpayer that it had to file tax returns for 1930 through 1933 because it had received during those years gross income subject to Federal income tax.  The taxpayer filed those returns on February 21, 1936, reporting net losses for each year.  Subsequently, the Commissioner issued a notice of deficiency to the taxpayer that disallowed all of the deductions claimed on the returns.  The Commissioner argued before the Board that the taxpayer's failure to file its tax returns timely meant that it was precluded by section 233 of the 1928 and 1933 Revenue Acts from deducting its expenses.  The Board disagreed, stating:

> That the petitioner received the gross incomes, incurred the expenses, and sustained the net losses as set out in the tabulation is not in dispute.  The contention of respondent is that such expenses are not deductible, for the sole reason that the petitioner, being a foreign corporation, is prohibited from

receiving the benefit of such deductions by the provisions of section 233 of the Revenue Acts of 1928 and 1932, because none of its returns for the periods involved was timely filed.  The gist of his contention is that the words in those sections "in the manner prescribed in this title" embrace timely filing of returns within their meaning and that, consequently, deductions are allowable to a foreign corporation only when its returns are filed within the time specified in section 235 of the Revenue Acts of 1928 and 1932, supra.  Under this section, 235, petitioner should have filed its returns for the periods involved on or before June 15 of each of the years 1931, 1932, 1933, and 1934, but did not file any returns until February 21, 1936, when it filed returns for all the periods.  The respondent argues that as a consequence of such untimely filing of the returns the petitioner is not entitled to the deductions of the expenses involved and that the tax should be computed upon its gross income.

We do not agree with respondent's contention.  It is unnecessary to assign any reason for such conclusion other than to say that our decision on this point is clearly controlled by the holding of the Board in Anglo-American Direct Tea Trading Co., Ltd., promulgated October 4, 1938, 36 B.T.A. No. 94.  Accordingly we hold that petitioner is entitled to the deduction of the expenses as set out in the above tabulation and that respondent erred in computing petitioner's taxes on the basis of its gross income.  [Mills, Spence & Co. v. Commissioner, supra; fn. ref. omitted.]

D.    Am. Inv. and Gen. Trust Co.

In Am. Inv. and Gen. Trust Co. v. Commissioner, a Memorandum Opinion of the Board of Tax Appeals dated April 13, 1939, the Board again applied its holding in Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938).  The Board found that the taxpayer, a foreign corporation, had not filed its 1929 and 1930 Federal income tax returns timely.  The Commissioner again

argued that this finding meant that the taxpayer was not entitled
to its deductions.  The Board disagreed, stating:

> this is not a "no return" case.  It is obvious,
> however, that the petitioner was delinquent in filing
> its returns.  The returns were due not later than
> June 15, 1930 and June 15, 1931, whereas they were not
> filed until after June 12, 1934.  The Commissioner
> argues that this foreign corporation can not receive
> the benefit of the deductions and credits allowed under
> Title I of the Revenue Act of 1928 because the filing
> of the delinquent returns was not the filing of returns
> "in the manner prescribed" in Title I.  This same
> argument has been considered and rejected by the Board
> in the case of Anglo-American Direct Tea Trading Co.,
> Ltd., 38 B.T.A. 711.  It is rejected here on authority
> of that case.  [Am. Inv. and Gen. Trust Co., Ltd. v.
> Commissioner, supra.]

E.  Taylor Sec., Inc.

Next, the Board decided Taylor Sec., Inc. v. Commissioner,
40 B.T.A. 696 (1939).  There, the Commissioner issued a notice of
deficiency to the foreign corporation taxpayer on March 23, 1937.
That notice reflected substitute returns that the Commissioner
had prepared for the taxpayer's 1930 through 1935 taxable years,
using only the taxpayer's income.  On June 16, 1937, the taxpayer
petitioned the Board as to the notice of deficiency, and the
Commissioner answered the petition shortly thereafter.  On
October 20, 1938, the taxpayer was notified by the Board that a
hearing was set for a stated session of the Board beginning
December 5, 1938.  Subsequently, after the Board continued the
date of that hearing until January 16, 1939, the taxpayer filed
its 1930 through 1935 tax returns on December 13, 1938.

The Board held that the taxpayer was not entitled to its claimed deductions because it had not filed a return as required by the statute.  In rejecting any argument that the taxpayer's returns were "returns" for this purpose, the Board distinguished Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra, on the grounds that there the taxpayer had filed its returns before the notice of deficiency was issued, those returns had been audited (not the returns prepared by the revenue agent), and the returns prepared by the revenue agent had never been accepted by the Commissioner.  See Taylor Sec., Inc. v. Commissioner, supra at 702-703.  The Board stated:

> Here the question is whether the petitioner, by filing returns after the respondent made his determination of deficiencies under the circumstances presented, relieved itself of the adverse condition in which it was situated by reason of section 233 and is entitled to the benefits to which it would otherwise have been entitled by the timely filing of returns.  In our opinion it may not.
>
> * * * we are unable to conclude that in enacting section 233, supra, it was the intention of Congress that delinquent returns filed by a foreign corporation after the respondent's determination should constitute the returns required as a prerequisite to the allowance of the credits and deductions ordinarily allowable to the corporations.  * * *  By section 233 the allowance to foreign corporations of the credits and deductions ordinarily allowable is specifically predicated upon such corporations filing returns.  In view of such a specific prerequisite it is inconceivable that Congress contemplated by that section that taxpayers could wait indefinitely to file returns and eventually when the respondent determined deficiencies against them they could then by filing returns obtain all the benefits to which they would have been entitled if their returns had been timely filed.  Such a construction would put a

premium on evasion, since a taxpayer would have nothing to lose by not filing a return as required by statute. [Id. at 703-704.]

F.  Ardbern/Blenheim

One year later, the Board decided Ardbern Co. v. Commissioner, 41 B.T.A. 910 (1940), and Blenheim Co. v. Commissioner, 42 B.T.A. 1248 (1940).  In Ardbern, the taxpayer was a foreign corporation that attempted to file Federal income tax returns for 1929 through 1932 in June 1937.  The taxpayer tendered those returns to the Commissioner's revenue agent, but the agent refused to accept them believing that the returns had to be filed with the Collector of Internal Revenue at Baltimore, Maryland.  The agent did not inform the taxpayer how to file those returns properly.  On July 3, 1937, the Commissioner issued a notice of deficiency to the taxpayer for the years in question and, 6 days later, prepared substitute returns for the taxpayer. On September 29, 1937, the taxpayer petitioned the Board with respect to the matter, and the Commissioner answered that petition on December 7, 1937.  On October 28, 1938, the taxpayer filed its 1929 through 1932 Federal income tax returns with the Collector of Internal Revenue at Baltimore, Maryland, claiming deductions and reporting no tax due.

The Board applied Taylor Sec., Inc. v. Commissioner, supra, and sustained the Commissioner's disallowance of deductions.  The Board stated:

Petitioner did not, by the lodgment of returns with * * * [the revenue agent], discharge the duty which the statute laid upon it. Also, the action of petitioner in filing returns with the collector at Baltimore on October 28, 1938, was ineffective to bring it within the limitations of the statute so as to entitle it to the benefit of deductions. These returns were filed (a) after respondent had determined the deficiencies and prepared returns for petitioner under section 3176 of the Revised Statutes, as amended, and (b) after the petition and answer had been filed and the case was at issue before the Board, and only approximately two and one-half months prior to the hearing. Returns filed under such circumstances do not meet the requirements of section 233. Taylor Securities, Inc., 40 B.T.A. 696. On the point under discussion, the facts of the instant proceeding are not distinguishable in any material respect from those of the Taylor case. On authority of that decision and for the reasons therein stated, which need not be repeated here, respondent's action in computing the present deficiencies without the allowance of deductions is approved. [Ardbern Co. v. Commissioner, 41 B.T.A at 919-920.]

Upon appeal, the Court of Appeals for the Fourth Circuit

modified and remanded the Board's decision on the authority of

Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711

(1938). The court stated:

fair dealing between the Government and a taxpayer would require the agent to whom the returns were improperly tendered for filing to advise the taxpayer as to the official and place where the returns should be filed. Here the agent Muller rejected the returns on the sole ground that they were improperly executed and did not notify the taxpayer that the returns could in no event be filed with him. Soon after the refusal to accept the returns the deficiency was determined against the taxpayer.

It is conceded that, if the return which taxpayer attempted to file before Muller in June 1937 had been properly filed before the Collector at Baltimore, taxpayer would have been entitled to the deductions

claimed, which represented expense incurred in connection with the earning of the income taxed. The deductions are denied merely because they were not claimed in a return properly filed until after the deficiency assessment had been made against taxpayer upon a return filed for him by the Commissioner in which no deductions were allowed. We think, however, that when return was filed by the Commissioner for the taxpayer, he should have given him the benefit of proper deductions for expense of doing business, of which he had been notified by the return which taxpayer had attempted to file with his agent, or, at least, that taxpayer should be allowed such deductions when, upon the assessment of a deficiency against him, he shows that prior to its assessment he attempted in good faith to file a return in which such deductions were claimed. This is nothing but elementary justice, and we find nothing in the statute which forbids it. The return made by the Commissioner was clearly not based upon the best available information.

While there is a specific penalty of 25 per centum fixed for failure to file tax returns, Section 291, Revenue Act of 1928, * * * there is no provision that there shall be an added penalty in the form of not allowing the delinquent taxpayer deductions to which it otherwise would be entitled. The Board held in Anglo-American Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711: "Inasmuch as separate sections deal with "manner" and "time," we think it highly improbable that Congress ever intended to include the element of time in the section dealing primarily with the manner of filing. We hold, therefore, that the mere fact the return was not filed within the time prescribed by section 235 does not, under the circumstances here presented, preclude the allowance of deductions claimed." [Ardbern Co. v. Commissioner, 120 F.2d at 426.]

The Board also followed Taylor Sec., Inc. v. Commissioner, 40 B.T.A. 696 (1939), in Blenheim Co. v. Commissioner, 42 B.T.A. 1248 (1940). There, the taxpayer was a foreign corporation that on June 15, 1935, filed a 1934 personal holding company return (Form 1120H) reporting income consisting only of dividends

received from domestic corporations.  The Commissioner learned

that the taxpayer had not filed a corporate income tax return

(Form 1120) for that year and asked the taxpayer to do so.  The

taxpayer declined.  On April 28, 1938, the Commissioner prepared

a substitute return for the taxpayer and, on May 18, 1938, issued

to it a notice of deficiency.  On August 9, 1938, the taxpayer

filed a Form 1120 for 1934.

The Board held that the filing of Form 1120H did not satisfy

the requirements of section 233 of the 1928 and 1932 Revenue Acts

because the personal holding company surtax was separate and

distinct from the corporate income tax.  Id. at 1251-1252.  As to

the Form 1120 filed by the taxpayer for 1934, the Board stated:

> Undoubtedly a taxpayer may litigate a
> determination of respondent on the basis of a return
> made by * * * [the Commissioner].  But, a "return"
> filed by a taxpayer after such a return has been
> prepared and filed for him by respondent, under the
> circumstances existing here, is a nullity and does not
> comply with section 233, supra.  The taxpayer can not
> thus take advantage from an alleged return submitted by
> the taxpayer not only after respondent's filing of its
> return * * * but also after the issuance of a notice of
> deficiency.  Taylor Securities, Inc., 40 B.T.A. 696.
> * * *  [Id. at 1251.]

On appeal, the Court of Appeals for the Fourth Circuit

affirmed.  The court first quoted section 233 of the 1928 and

1932 Revenue Acts and then stated with respect thereto:  "It is

true that this section contains no reference to a time element."

Blenheim Co. v. Commissioner, 125 F.2d at 908.  The court then

noted that section 233 of the 1928 and 1932 Revenue Acts applied

only to foreign corporations and explained that Congress intended to impose special conditions on foreign corporations vis-a-vis domestic corporations.  The court stated:

> The difficulty here encountered by the Commissioner in attempting to ascertain the petitioner's correct income tax is a striking example of the many administrative problems inherent in the application of the federal income tax to foreign corporations.  This has prompted Congress to impose special conditions on such corporations.  Indeed, unless a foreign corporation is induced voluntarily to advise the Commissioner of all of its income attributable to sources within the United States and of the exact nature of all deductions from such income, the Commissioner may never learn even of the corporation's existence, and, in any event, he will probably be unable to determine the correct amount of its taxable income.
>
> The situation is pregnant with possibilities of tax evasion.  In express recognition of this fertile danger to the orderly administration of the income tax as applied to foreign corporations, Congress conditioned its grant of deductions upon the timely filing of true, proper and complete returns.  This is in addition, of course, to the 25% penalty provided by Section 291 of the 1934 Act for both foreign and domestic corporations which either file no return or a late return unless "reasonable cause" for the failure to file a timely return is shown.  * * *  [Id. at 909.]

As to the "terminal date" that the Board had adopted in Taylor Sec., Inc. v. Commissioner, supra, the Court of Appeals for the Fourth Circuit explained that this date was justified notwithstanding the absence in the statute of a time element. The court stated:

> The conclusion that the preparation of a return by the Commissioner a reasonable time after the date it was due terminates the period in which the taxpayer may enjoy the privilege of receiving deductions by filing

its own return, is consistent not only with the intention of Congress * * * but also with considerations of sound administrative procedure and the generally accepted rule concerning the number of returns which may be filed.

This terminal date, which the Board of Tax Appeals first adopted in Taylor Securities v. Commissioner, 40 B.T.A. 696 (1939), is directed against those foreign corporations which instead of being induced voluntarily to advise the Commissioner of their domestic operations, might find their interests best served by filing no return whatever, and then waiting until such time, if any, as the Commissioner discovers their existence and acquires sufficient information about their income on which to base a return. Unless they are precluded from then obtaining the deductions and credits under such circumstances, such foreign corporation can, if detected, come in for the first time after the Commissioner has made a return and suffer no economic loss other than the general 25% late filing penalty which applies to domestic as well as foreign corporations.

Without prescribing an absolute and rigid rule that whenever the Commissioner files a return for a foreign corporation the taxpayer is completely and automatically denied the benefit of deductions or credits, we yet hold that the facts of the instant case justify a disallowance of deductions which petitioner might otherwise have been entitled to claim, had it filed a timely return in compliance with the statutory requirement. [Blenheim Co. v. Commissioner, 125 F.2d at 910.]

The Court of Appeals for the Fourth Circuit also found in the legislative history of section 217 of the Revenue Act of 1918 further support for that conclusion and its reading of the statute to the effect that a foreign corporation was entitled to deduct its expenses upon the filing of an accurate and complete return:

It will thus be noted that Section 233 relating to foreign corporations, which made its first appearance in the Revenue Act of 1928, 26 U.S.C.A. Int. Rev. Acts, page 419, is almost verbally identical with this section governing nonresident aliens which has been a part of the revenue laws since 1918. The application of Section 217 of the 1918 Act is clear. From the outset the Treasury Regulations have expressly provided that no deductions were allowable to nonresident aliens unless an accurate and complete return was filed, and the filing of the return by the Commissioner fixed the tax liability. * * *

* * * * * * *

The foregoing regulation [Article 311 of Treasury Regulations 45] states specifically that deductions are allowable to a nonresident alien only if a return is filed, and, if no return has been filed at the time the Commissioner prepares a return for the taxpayer, the tax shall be assessed with no allowance for deductions. Congress may be presumed to have adopted this longstanding administrative construction when it enacted and reenacted Section 233. Brewster v. Gage, 1930, 280 U.S. 327, 50 S. Ct. 115, 74 L.Ed. 457, Morgan v. Commissioner, 1940, 309 U.S. 78, 626, 60 S. Ct. 424, 84 L.Ed. 585, 1035. [Id. at 910.]

The Court of Appeals for the Fourth Circuit distinguished its holding in Ardbern Co. v. Commissioner, 120 F.2d 424 (4th Cir. 1941), stating:

A substantially different factual situation is presented in the case before us. Here the Commissioner prepared a return only after he had unsuccessfully made repeated requests to the taxpayer to do so, and only after the taxpayer had flouted all of these requests. Then, after the Commissioner had assessed a deficiency on the basis of his return, but only then, the petitioner filed its petition for review by the Board and also a return.

Unless the deductions are here denied, Section 233 will become a meaningless provision, for if, after the Commissioner has earnestly attempted to obtain a return by the taxpayer and has waited a reasonable time before

filing his own return, the taxpayer may still enjoy the privilege of all deductions and credits, there is then no inducement to foreign corporations voluntarily to file timely returns.  In the absence of demonstrable fraud, they will, by self-serving uncooperative conduct, suffer no loss other than the general late filing penalty which is applicable to domestic as well as foreign corporations.  Such a construction of the statute would put a premium on tax evasion and would reduce the administration of the tax laws to mere idle activity.  [Id. at 909-910.]

G.  Georday Enters.

In Georday Enters. v. Commissioner, 126 F.2d 384 (4th Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals, a companion case to Blenheim Co. v. Commissioner, 125 F.2d 906 (4th Cir. 1942), the Court of Appeals for the Fourth Circuit affirmed the Board's denial of deductions under section 233 of the 1928 and 1932 Revenue Acts.  The court noted that the case for the disallowance was even stronger than in Blenheim because the taxpayer did not attempt to file a return voluntarily until after a petition had been filed with the Board.  The court stated:

> On the issues of the timeliness of Georday's federal income tax return and the imposition of a 25% penalty, our decision in the Blenheim case is determinative. The case for disallowance of Georday's deductions is even stronger here because Georday failed to file a return voluntarily not only after a return had been filed for it by the Commissioner and after a deficiency letter had been sent to it, but even after a petition to the Board had been filed.  In point of time, Georday filed its return more than five years after the date on which it was due.
>
> Georday, therefore, clearly failed to file its return within the reasonable terminal period prescribed in the Blenheim case and is now precluded from obtaining the benefits of any deductions it might have

otherwise been entitled to claim had it filed a timely
return. * * * [Georday Enters. v. Commissioner, supra
at 388.[12]]

H. Espinosa

While each of the previously discussed cases dealt with the
applicability of former section 233 to a foreign corporation,
Espinosa v. Commissioner, 107 T.C. 146 (1996), involved the
applicability of section 874(a) to a nonresident alien taxpayer.
In Espinosa, the Commissioner had mailed a letter to the taxpayer
on November 13, 1992, asking him if he had filed returns and, if
he had not, instructing him to file returns or otherwise respond.
The letter stated that the Commissioner would file substitute
returns for the taxpayer if the taxpayer did not respond by
December 1, 1992. On January 12, 1993, the taxpayer had not yet
responded, and the Commissioner wrote the taxpayer a second
request, adding that "your tax liability [will be determined]
based on the information we have" if the taxpayer did not respond
within 20 days.

On February 3, 1993, after the taxpayer had again failed to
respond, the Commissioner notified the taxpayer that the
Commissioner had filed substitute returns for the taxpayer for
1987 through 1991. On March 23, 1993, the Commissioner notified
the taxpayer that the substitute returns had been computed

---

[12] The "terminal period prescribed in the Blenheim case"
(emphasis added) is the point where the Commissioner prepared a
substitute return for the taxpayer.

without the benefit of any deductions.  On October 7, 1993, the taxpayer submitted Federal income tax returns for 1987 through 1991; apparently, these returns were never filed by the Commissioner.  The returns reported net losses from rental properties located in the United States.  On January 13, 1994, the Commissioner issued a notice of deficiency to the taxpayer for 1987 through 1991.  The Commissioner determined in the notice of deficiency that the taxpayer was liable for deficiencies and additions to tax as ascertained from the substitute returns. Pursuant to section 874(a), the Commissioner did not allow the taxpayer to deduct any of his related expenses.[13]

This Court upheld the Commissioner's determination, deciding that a nonresident alien may not avoid the sanctions of section 874(a) by filing returns after the Commissioner has prepared returns for the taxpayer, but before the Commissioner has issued a notice of deficiency.  See Espinosa v. Commissioner, supra at 150, 158.  The Court noted that the Commissioner before preparing the substitute returns had informed the taxpayer that he had not filed a Federal income tax return and had given him a reasonable time to do so.  Id. at 157.

---

[13] Although the Commissioner in the notice of deficiency had characterized the taxpayer's rental income as effectively connected income, the Court was careful to note that neither party in that case had questioned whether the taxpayer had made a valid election to support that characterization.  See Espinosa v. Commissioner, 107 T.C. 146, 150 (1996).

Respondent argues in this case that the Court in Espinosa v. Commissioner, supra at 156, interpreted Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), to hold solely that a foreign corporation's (or nonresident alien's) filing of a Federal income tax return after the due date set forth in section 6072 (and its predecessors) is not the only factor to consider in determining whether the corporation (or alien) is entitled to deduct its expenses.  We disagree.  The Court in Espinosa on the referenced page made the following observation as to Anglo-Am. Direct Tea Trading Co.:  "while a terminal date does exist [after which a foreign corporation or nonresident alien can no longer claim the benefit of deductions by filing a Federal income tax return], the timely filing requirements of section 6072(c) are not determinative as to whether a taxpayer [the corporation or alien] is entitled to the benefit of deductions."  The Court in Espinosa did not limit Anglo-Am. Direct Tea Trading Co. to that observation or to any other point.  In fact, as the Board explained its holding in Anglo-Am. Direct Tea Trading Co. shortly after rendering it:

> In the Anglo-American Co. case, it was held that the phrase in section 233 of the Revenue Acts of 1928 and 1932, "in the manner prescribed in this title", did not mean within the time prescribed in the titles of the respective acts and the allowance of the credits and deductions otherwise allowable by such acts was not dependent under section 233 on the filing of returns within the time prescribed by said acts.  [Taylor Sec., Inc. v. Commissioner, 40 B.T.A. at 702.]

Accord <u>Am. Inv. and Gen. Trust Co. v. Commissioner</u>, a Memorandum

Opinion of the Board of Tax Appeals dated April 13, 1939; <u>Mills,</u>

<u>Spence & Co. v. Commissioner</u>, a Memorandum Opinion of the Board

of Tax Appeals dated Oct. 5, 1938.  In addition, the Court of

Appeals for the Fourth Circuit in <u>Ardbern Co. v. Commissioner</u>,

120 F.2d at 425-426, quoted and applied favorably the following

holding from <u>Anglo-Am. Direct Tea Trading Co.</u> in deciding for the

taxpayer:

> Inasmuch as separate sections deal with "manner" and
> "time," we think it highly improbable that Congress
> ever intended to include the element of time in the
> section dealing primarily with the manner of filing.
> We hold, therefore, that the mere fact the return was
> not filed within the time prescribed by Section 235
> does not, under the circumstances here presented,
> preclude the allowance of deductions claimed.

I.  <u>Inverworld, Inc.</u>

In <u>Inverworld, Inc. v. Commissioner</u>, T.C. Memo. 1996-301,

the taxpayer was a foreign corporation that had not as of the

time of trial filed a Federal income tax return for any of the

relevant years.  All of those years predated the effective date

of the disputed regulations.  See discussion <u>infra</u> p. 48.

The taxpayer noted that the applicable regulations had been

issued in 1957 and that those regulations did not contain a

timely filing requirement.  The taxpayer argued that such a

requirement was therefore not applicable to the relevant years.

The Court did not decide that argument.  Instead, the Court

applied the opinions of the Court of Appeals for the Fourth

Circuit in <u>Blenheim v. Commissioner</u>, 125 F.2d 906 (4th Cir. 1942), and <u>Ardbern Co. v. Commissioner</u>, <u>supra</u>, and held that section 882(c)(2) applied to deny the taxpayer the benefit of any deductions for those years because the taxpayer had never filed a return.

VII.  <u>Regulations Interpreting Section 882(c)(2) and Its Predecessors</u>

A.  <u>Background</u>

The Secretary never issued regulations interpreting former section 233.  Since the enactment of section 882 of the 1954 Code, the Secretary has issued four sets of regulations interpreting the relevant text of that section.  The first set of regulations was issued in 1957 (1957 regulations) and was amended in 1990 through the second set of regulations (1990 regulations), which contain the disputed regulations.  The third set of regulations was issued in 2002 (2002 temporary regulations) as temporary regulations amending a portion of the 1990 regulations. The fourth set of regulations was issued in 2003 (2003 regulations) and finalized the 2002 temporary regulations.[14]

---

[14] In addition to the three sets of regulations that were issued after the 1957 regulations, the Secretary in 1980 issued one other set of regulations (1980 regulations) that pertained to the 1957 regulations.  See T.D. 7749, 1981-1 C.B. 390.  The 1980 regulations amended the 1957 regulations by adding a new paragraph (c), the substance of which is now reflected in sec. 1.882-4(b), Income Tax Regs.  Because the 1980 regulations relate to a subject that is not relevant to our analysis, we make no further reference to them.

B.  1957 Regulations

On October 23, 1957, the Secretary filed in the Federal
Register the 1957 regulations interpreting section 882 of the
1954 Code.  See sec. 1.882-4, Income Tax Regs., 22 Fed. Reg. 8362
(Oct. 23, 1957).  According to those regulations, section 882 of
the 1954 Code pertained to "resident corporations"; i.e.,
corporations with a trade or business in the United States, and
such a corporation could deduct its expenses only if it filed a
true and accurate Federal income tax return in accordance with
section 6012 and the regulations thereunder.  The 1957
regulations stated that a foreign corporation would be taxed on
its gross income, without the benefit of any deductions, if it
did not so file such a return.  The 1957 regulations did not
require that the required return be filed by a set time.  Nor did
the 1957 regulations state that the relevant text included a
timely filing requirement.  The 1957 regulations stated in
relevant part:

> § 1.882-4 Allowance of Deductions to Foreign
> Corporations.--* * *
>
> (b) Resident foreign corporations.--(1) Return
> necessary.  A resident foreign corporation shall
> receive the benefit of the deductions allowed to it
> with respect to the income tax, only if it files or
> causes to be filed with the district director, in
> accordance with section 6012 and the regulations
> thereunder, a true and accurate return of its total
> income received from all sources within the United
> States.

    (2) Tax on gross income.  If a return is not so
filed, the tax shall be collected on the basis of gross
income, determined in accordance with § 1.882-1 but
without regard to any deductions otherwise allowable.

C.  1990 Regulations

On December 10, 1990, the Secretary issued the 1990

regulations to amend section 1.882-4, Income Tax Regs., as

adopted in 1957.  See sec. 1.882-4, Income Tax Regs., 55 Fed.

Reg. 50830 (Dec. 11, 1990), T.D. 8322, 1990-2 C.B. 172.  The

amendments were first published as proposed regulations.  See

sec. 1.882-4, Proposed Income Tax Regs., 54 Fed. Reg. 31547

(July 31, 1989).  In the preamble to the proposed regulations,

the Secretary explained:  "Since the filing of a timely return is

one of the requirements set forth in subtitle F, these

regulations provide that otherwise allowable deductions and

credits will be allowed only if a return is filed by the time

limits as set forth in these regulations."  Id.  As finalized,

the 1990 regulations became effective July 31, 1990, for taxable

years ended after that date.  See sec. 1.882-4, Income Tax Regs.,

supra, T.D. 8322, 1990-2 C.B. at 172.

The 1990 regulations added to the 1957 regulations a general

requirement that a foreign corporation file its Federal income

tax return timely; i.e., generally before the 18-month deadline,

in order to deduct its expenses for the year covered by the

return.  As respondent asserts in brief, a timely filing

requirement was added because:

When <u>Anglo-American</u> and its progeny were decided, the scale and nature of international business activity was markedly different from today's modern business environment. At that time, international travel was a time-consuming and cumbersome endeavor. Transatlantic air travel was in its infancy, zeppelins and cruise ships were the predominant means of travel. Books and records were in paper, not electronic form. Data and information was transmitted via mail.

In the years since <u>Anglo-American</u>, there have been dramatic changes and increases in the nature and level of international business activity. International air travel is commonplace, taking hours instead of days. Books and records are now maintained in electronic form on computers. Data, information, and money are transmitted around the world in electronic form. Businesses have instantaneous access to information via the internet. Documents are delivered via overnight delivery or by facsimile.

Section 1.882-4(a)(2), Income Tax Regs., as amended in 1990,

states:

(2) <u>Return necessary</u>. A foreign corporation shall receive the benefit of the deductions and credits otherwise allowed to it with respect to the income tax, only if it timely files or causes to be filed with the Philadelphia Service Center, in the manner prescribed in subtitle F, a true and accurate return of its taxable income which is effectively connected, or treated as effectively connected, for the taxable year with the conduct of a trade or business in the United States by that corporation. * * *

Section 1.882-4(a)(3)(i), Income Tax Regs., as amended in 1990,

goes on to set forth filing deadlines by which to measure whether

the timely filing requirement has been met. See <u>supra</u> note 4.

Section 1.882-4(a)(3)(ii), Income Tax Regs., as amended in 1990,

also states, without further explanation, that "The filing

deadlines set forth in paragraph (a)(3)(i) of this section may be

waived by the District Director or Assistant Commissioner (International), in rare and unusual circumstances if good cause for such waiver, based on the facts and circumstances, is established by the foreign corporation."

As to the inclusion of the timely filing requirement, the preamble to the 1990 regulations states in relevant part:

> Commentators questioned the validity of the filing deadlines as set forth in the proposed regulations. The filing deadlines were not eliminated in the final regulations, however, since the statute clearly provides for the denial of deductions and credits if returns are not filed in a timely manner.  This requirement is justified because of different administrative and compliance concerns with regard to nonresident alien individuals and foreign corporations. [T.D. 8322, supra, 1990-2 C.B. at 172, 55 Fed. Reg. 50827 (Dec. 11, 1990).]

Among the referenced commentators was the American Bar Association Section of Taxation (ABAST).  See Letter from Holden, Chair, Section of Taxation, American Bar Association Section of Taxation (May 25, 1990), reprinted in 90 TNT 120-28 (June 7, 1990).  The ABAST commented that the timely filing requirement was inconsistent with section 882(c)(2) and supported that comment by citing Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), Blenheim Co. v. Commissioner, 125 F.2d 906 (4th Cir. 1942), Ardbern Co. v. Commissioner, 120 F.2d 424 (4th Cir. 1941), and Georday Enters. v. Commissioner, 126 F.2d 384 (4th Cir. 1942), all of which, the ABAST stated, rejected such a requirement.  See Letter from

Holden, supra. The ABAST also observed that there had been "almost countless tax bills over the past 50 years, including recodifications in 1939, 1954 and 1986" and concluded that Congress must have acquiesced in the interpretation set forth in those cases. Id.

D. 2002 Temporary Regulations

On January 28, 2002, the Secretary filed with the Federal Register the 2002 temporary regulations consisting of section 1.882-4T(a)(3)(ii), (iii), and (iv), Temporary Income Tax Regs., 67 Fed. Reg. 4217 (Jan. 29, 2002). These temporary regulations amended the waiver standard prescribed in section 1.882-4, Income Tax Regs., as amended in 1990, and listed examples of the amended standard. The 2002 temporary regulations were effective for open years for which a request for a waiver was filed on or after January 29, 2002.

E. 2003 Regulations

On March 7, 2003, the Secretary replaced the 2002 temporary regulations with the 2003 regulations. See 68 Fed. Reg. 11313 (March 7, 2003). The 2003 regulations allow the Commissioner to waive the 18-month deadline prescribed in the 1990 regulations if the foreign corporation "establishes to the satisfaction of the Commissioner or his or her delegate that the corporation, based on the facts and circumstances, acted reasonably and in good faith in failing to file a U.S. income tax return". Sec.

1.882-4(a)(3)(ii), Income Tax Regs.  Section 1.882-4(a)(3)(ii) and (iii), Income Tax Regs., as finalized in the 2003 regulations, is effective for open years for which a request for a waiver is filed on or after January 29, 2002.  See sec. 1.882-4(a)(3)(iv), Income Tax Regs.

In the case of the subject returns, the 18-month deadlines are May 15, 1996, 1997, and 1998, respectively (i.e., 18 months after the 15th day of the sixth month after the close of the taxable year).

VIII.  Secretary's Authority To Issue Regulations

The Secretary may issue two types of regulations.  See Tutor-Saliba Corp. v. Commissioner, 115 T.C. 1, 7 (2000); Estate of Pullin v. Commissioner, 84 T.C. 789, 795 (1985); see also E.I. duPont de Nemours & Co. v. Commissioner, 41 F.3d 130, 135 (3d Cir.), affg. 102 T.C. 1 (1994).  The first type, legislative regulations, are issued pursuant to a specific delegation from Congress to the Secretary.  The second type, interpretative regulations, are issued under the general authority vested in the Secretary under section 7805(a).

Respondent acknowledges that the disputed regulations are interpretative regulations.  Section 7805(a) reflects a broad delegation of general authority from Congress to the Secretary to prescribe all needful rules and regulations for the enforcement of the Internal Revenue Code.  See United States v. Correll,

389 U.S. 299, 306-307 (1967).  The authority delegated to the Secretary, however, is not limitless and, if exercised improperly, may usurp the role of Congress as the legislator in our system of Government.  The Secretary's authority to issue regulations is not the power to make law; it is the power to carry into effect the will of Congress as expressed in the statute under which the regulations are prescribed.  See Manhattan Gen. Equip. Co. v. Commissioner, 297 U.S. 129, 134-135 (1936).  When a statute's provisions are unambiguous, and its directive is specific, the Secretary has no power to amend that statute by regulation.  See Koshland v. Helvering, 298 U.S. 441, 447 (1936).

IX.  This Court's Review of an Interpretative Regulation

This Court is empowered to invalidate a regulation that exceeds the authority of the Secretary to issue it.  See, e.g., Profl. Equities, Inc. v. Commissioner, 89 T.C. 165 (1987); Estate of Pullin v. Commissioner, supra; Stephenson Trust v. Commissioner, 81 T.C. 283, 288 (1983); Estate of Boeshore v. Commissioner, 78 T.C. 523, 527 (1982); Washington v. Commissioner, 77 T.C. 656 (1981), affd. 692 F.2d 128 (D.C. Cir. 1982).  When this Court reviews an interpretative Federal tax regulation, we generally apply the analysis set forth by the Supreme Court in Natl. Muffler Dealers Association v. United

<u>States</u>, 440 U.S. 472 (1979).[15]  See, e.g., <u>Robinson v. Commissioner</u>, 119 T.C. 44, 70 (2002); <u>Walton v. Commissioner</u>, 115 T.C. 589, 597-598 (2000); <u>UnionBancal Corp. v. Commissioner</u>, 113 T.C. 309, 317 (1999).  Under <u>Natl. Muffler</u>, which like the present case involved an interpretative regulation issued under section 7805(a), an interpretative regulation is valid if it implements a congressional mandate in a reasonable manner.[16]  See <u>Natl. Muffler Dealers Association v. United States</u>, <u>supra</u> at 476-477 (citing <u>United States v. Cartwright</u>, 411 U.S. 546, 550 (1973); <u>United States v. Correll</u>, <u>supra</u> at 307); see also <u>United States v. Cleveland Indians Baseball Co.</u>, 532 U.S. 200, 218-219 (2001); <u>Newark Morning Ledger Co. v. United States</u>, 507 U.S. 546, 575-576 (1993); <u>Rowan Cos. v. United States</u>, 452 U.S. 247, 252-253 (1981).  We must defer to a Federal tax regulation that is reasonable under this standard.  Cf. <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001); <u>Smiley v. Citibank (S.D.), N.A.</u>, 517 U.S. 735, 739 (1996).

---

[15] A task force of the American Bar Association has recently concluded likewise that the Supreme Court primarily reviews interpretative Federal tax regulations under the analysis set forth in <u>Natl. Muffler Dealers Association v. United States</u>, 440 U.S. 472 (1979).  See Salem et al., ABA Section of Taxn. Report of the Task Force on Judicial Deference, 104 Tax Notes 1231 (2004).

[16] Legislative regulations, by contrast, are upheld "unless arbitrary, capricious, or manifestly contrary to the statute". <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 844 (1984).

An interpretative Federal tax regulation is reasonable under Natl. Muffler Dealers Association v. United States, supra, only if it "harmonizes with the plain language of the statute, its origin, and its purpose." Id. at 477; see also United States v. Vogel Fertilizer Co., 455 U.S. 16, 26 (1982). For this purpose,

> A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. [Natl. Muffler Dealers Association v. United States, supra at 477.]

Following its decision in Natl. Muffler Dealers Association v. United States, supra, the Supreme Court decided Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). There, the Supreme Court stated:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

⁹ The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  * * *  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

[Id. at 842-843 (some fn. refs. omitted; citations omitted).]

The question arises from the timing of these two decisions whether the Supreme Court intended for Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., supra, to replace Natl. Muffler Dealers Association v. United States, supra, in the review of a Federal tax regulation.  We have previously stated with respect to that question: "we are inclined to the view that the impact of the traditional, i.e., National Muffler standard, has not been changed by Chevron, but has merely been restated in a practical two-part test with possibly subtle distinctions as to the role of legislative history and the degree of deference to be accorded to a regulation."  Central Pa. Sav. Association & Subs. v. Commissioner, 104 T.C. 384, 392 (1995); see also id. at 390-392 (discussing the review of Federal tax regulations under Natl. Muffler in relation to Chevron); cf. E.I. duPont de Nemours & Co. v. Commissioner, 41 F.3d 130 (3d Cir. 1994) (questioning whether Chevron applies to interpretative Federal tax regulations). Here, we conclude likewise that we need not parse the semantics of the two tests to discern any substantive difference between

them.  While we apply a <u>Natl. Muffler</u> analysis, our result under

a <u>Chevron</u> analysis would be the same.

X.  <u>Review of the Disputed Regulations</u>

A.  <u>Overview</u>

We conclude that the timely filing requirement in the

disputed regulations does not harmonize with the plain language,

origin, or purpose of the relevant text of section 882(c)(2).  A

plain reading of the relevant text in the context of the Internal

Revenue Code shows that the text includes no timely filing

requirement.  Where, as here, the Secretary has prescribed a

regulation that is inconsistent with the plain meaning of a

statute, the regulation is invalid, and any deference to the

Secretary's interpretation of that statute under <u>Natl. Muffler</u>

<u>Dealers Association v. United States</u>, 440 U.S. 472 (1979), is

unwarranted.  Such is especially so where, as here, the disputed

regulations also are unreasonable under an analysis of <u>Natl.</u>

<u>Muffler Dealers Association v. United States</u>, <u>supra</u> at 477.

B.  <u>Plain Meaning of the Relevant Text</u>

We begin our analysis of the relevant text with the words

used therein.  We apply the plain meaning of the words used in a

statute unless we find that a word's plain meaning is ambiguous.

See <u>Garcia v. United States</u>, 469 U.S. 70, 76 n.3 (1984); see also

<u>Ex parte Collett</u>, 337 U.S. 55 (1949).  When interpreting a

statute, "[t]he judiciary is the final authority on issues of

statutory construction".  <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, <u>supra</u> at 843 n.9; see also <u>Volkswagenwerk v. FMC</u>, 390 U.S. 261, 272 (1968); <u>FTC v. Colgate-Palmolive Co.</u>, 380 U.S. 374, 385 (1965).

We agree with the holdings in <u>Anglo-Am. Direct Tea Trading Co. v. Commissioner</u>, 38 B.T.A. 711 (1938), and its progeny, that the plain meaning of the word "manner", as used in the relevant text, does not include an element of time.  For purposes of our Federal tax system, Congress has consistently used the word "time" together with the word "manner" when it intended to include the meanings of both words in a single taxing section. In the Revenue Act of 1928, for example, from which section 233 emanated, Congress used both words in sections 115(g) and 291. The former section addressed the situation where "a corporation cancels or redeems its stock * * * at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend".  Revenue Act of 1928, ch. 852, sec. 115(g), 45 Stat. 822.  The latter section provided that additions to tax for failure to file a tax return "shall be collected at the same time and in the same manner and as part of the tax".  Revenue Act of 1928, ch. 852, sec. 291, 45 Stat. 857.

In the 1939 Code, when the relevant text was first codified, Congress again used the words "time" and "manner" together when

it intended to include the meanings of both words in a single statutory provision.  See, e.g., 1939 Code secs. 55(b)(1) and (2), (d)(1)(B), 115(g), 291, 821(b), 864(b), 1203, 1420(c), 1421, 1502, 1522, 1530(b), 1604, 1716, 1902(b), 2190, 2471, 2701, 2802(d)(2), 2803(d), 2854, 2903(c), 2905, 3150(b)(1), 3271, 3310(c), 3448(a), 3461, 3467(b), 3612(e), 3640, 3701, 3704(b), 3975, 3976(a).  Many of those instances applied specifically to the time and manner of the filing of a return.  See, e.g., 1939 Code secs. 821(b) and 864(b) ("The return required of the executor under subsection (a) shall be filed at such times and in such manner as may be required by regulations made pursuant to law"), 2471 ("Such returns shall contain such information and be made at such times and in such manner as the Commissioner, with the approval of the Secretary, may by regulations prescribe"), 2701 (same language), 3448(a) (same language), 3461 (same language), 3467(b) (same language); see also 1939 Code secs. 1203 (stating the specific time by which a return must be filed and that the "return shall contain such information and be made in such manner as the Commissioner with the approval of the Secretary may by regulations prescribe"), 1604 (similar language), 1716 (similar language).

In the 1954 Code, when Congress recodified the relevant text with a reference to "subtitle F", Congress continued to use the words "time" and "manner" together to express its intent to

include both meanings in a single provision.  See, e.g., 1954 Code secs. 6033(b), 6036, 6081(b), 6103(b)(1) and (d)(1)(B), 6201(a), 6205(a)(1) and (b), 6302(c), 6335(b), 6338(b), 6413(b), 7204 for instances where Congress upon enactment of the 1954 Code used both words in a single provision in subtitle F (then secs. 6001 through 7852).  Congress did likewise in the Foreign Investors Tax Act of 1966, when it legislated as to section 882, and in the 1986 Code, when it recodified the relevant text a second time.  As to the former legislation, see, e.g., secs. (as amended by the Foreign Investors Tax Act of 1966) 871(d)(3), 981(d).  As to the latter legislation, see, e.g., 1986 Code secs. 6033(b), 6036,  6038(a)(2), 6038A(a), 6038B(a), 6039C(c)(4), 6039D(a) and (c), 6039F(a)(1), 6045(d), 6047(b), 6050A(a), 6050K(a), 6053(c)(1), 6059(c), 6081(b), 6096(c), 6103(f)(4)(A) and (B) and (p)(1), 6104(a)(1)(A), 6157(a)(2), 6164(b), 6166(b)(7), 6167(a), 6201(a), 6205(a)(1) and (b), 6230(i), 6302(c), 6324A(a) for instances where Congress upon enactment of the 1986 Code used both words in a single provision in subtitle F (then secs. 6001 through 7872); see also 1986 Code sec. 6039(a) (stating the specific time by which a "written statement" must be furnished "in such manner and setting forth such information as the Secretary may by regulations prescribe").

We believe that Congress acted intentionally and purposely when it included both "time" and "manner" in single sections of

the referenced statutes but omitted the word "time" in favor of only the word "manner" in other single sections of those statutes; e.g., as in section 882(c)(2) and its predecessors. See BFP v. Resolution Trust Corp., 511 U.S. 531, 537-538 (1994); Chicago v. Envtl. Def. Fund, 511 U.S. 328, 338 (1994); Keene Corp. v. United States, 508 U.S. 200, 208 (1993); Russello v. United States, 464 U.S. 16, 23 (1983). In construing a statute, we must give a definite meaning to every word and expression found therein, Dubuque & P.R. Co. v. Litchfield, 64 U.S. 66, 77 (1859); Early v. Doe, 57 U.S. 610, 617 (1853), and we must shy away from interpreting a statute in a way that would render any part of it redundant or surplusage, see Platt v. Union Pac. R.R. Co., 99 U.S. 48, 58-59 (1878). See Jones v. United States, 529 U.S. 848, 857 (2000); United States v. Menasche, 348 U.S. 528, 538-539 (1955); see also United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235-236 (1955) (in applying the traditional rules of statutory construction, a court should assume that Congress uses language in a consistent manner, unless otherwise indicated). Such is especially so where, as here, we understand Congress's use of the word "manner" in the referenced Code sections as giving context to that word. We understand that use to refer to items of information and not to refer to the time for the filing of a return or the furnishing of any other document. We conclude that Congress, by using only the word

"manner" in section 882(c)(2), did not intend to include in that provision any element of time.[17]   Nor do we believe that Congress intended for the word "manner" in that situation to have a flexible definition to be prescribed by the Secretary in order to carry out the text's general purpose, as was the case in <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. at 844. Instead, we believe that the word "manner", when used in the relevant text, was intended by Congress to have only the single definition that we decide herein.

Respondent requests that we defer to the Secretary's interpretation of the word "manner" to include a timely filing requirement.  We decline to do so.  Because we find the meaning of the word "manner" as used in section 882(c)(2) to be plain and unambiguous, any deference that we would otherwise accord to the Secretary's interpretation of the word "manner" is unwarranted.[18]

---

[17] In fact, as to the 18-month period set forth in the regulations, it is not only arbitrary but without any statutory basis at all.  As we understand the Secretary's formation of that period, it corresponds to 1 year after the 6-month extended due date of the return.  See T.D. 8322, 1990-2 C.B. 172, 172-173, 55 Fed. Reg. 50827 (Dec. 11, 1990); see also sec. 6081(a) (generally allowing the Secretary to grant extensions of up to 6 months).  Where that 1-year rule came from, we do not know.

[18] A term is ambiguous if it is "'capable of being understood in two or more possible senses or ways'".  <u>Chickasaw Nation v. United States</u>, 534 U.S. 84, 94 (2001) (quoting Webster's Ninth New Collegiate Dictionary 77 (1985)).  Although the disputed regulations are contrary to our construction of the text, as is the construction of the relevant text by respondent, we do not believe that these contrary interpretations mean that
(continued...)

See <u>United States v. Mo. Pac. R. Co.</u>, 278 U.S. 269, 280 (1929);

<u>United States v. Tanner</u>, 147 U.S. 661, 663 (1893); <u>Swift Co. v.

United States</u>, 105 U.S. 691, 695 (1881); see also <u>Atl. Mut. Ins.

Co. v. Commissioner</u>, 523 U.S. 382, 387 (1998).  Deference is

especially unwarranted where, as here, the Secretary's

construction of the relevant text does not fill in a gap left

open by the statute as to a timeliness requirement but simply

adopts respondent's unsuccessful litigating position, with total

disregard to firmly established judicial precedent,[19] and adds an

---

[18](...continued)
the relevant text as of the issuance of the disputed regulations
was reasonably capable of being understood in two or more senses
or ways.  The Treasury Department was not the first authoritative
body to have interpreted the relevant text.  That text had
previously been construed on a number of occasions by both the
Court of Appeals for the Fourth Circuit and the Board.  In
addition, contemporaneous to the seminal interpretation of the
relevant text in <u>Anglo-Am. Direct Tea Trading Co. v.
Commissioner</u>, 38 B.T.A. 711 (1938), Congress codified the text in
the 1939 Code without any significant change from the text
construed by the Board in <u>Anglo-Am. Direct Tea Trading Co.</u>.
Then, after both the Court of Appeals for the Fourth Circuit and
the Board had repeatedly and consistently construed the relevant
text as not including a timely filing requirement, Congress
recodified the relevant text in the 1954 and 1986 Codes, again
without any significant change.  Given the multiple legislative
reenactments of the relevant text and the consistent and
unanimous prior interpretations of that text by the Court of
Appeals for the Fourth Circuit and the Board, we do not believe
that the relevant text as of the time of the disputed regulations
was reasonably capable of being understood in the sense advocated
by respondent and adopted by the Secretary in the form of the
disputed regulations.

[19] We include the Board in our references to the judiciary.
Although the Board was established as "an independent agency in
the executive branch of the Government", Revenue Act of 1924, ch.
(continued...)

impermissible restriction to the statute.[20]  The functional

reasons for deference to agencies; i.e., the agencies' expertise

and experience, do not carry the same force when interpreting the

word "manner" for purposes of the relevant text.  The judiciary

has enough expertise and experience to ascertain congressional

intent with respect to that word, and any deference that is owed

to the Secretary does not mean that the judiciary as a matter of

course should simply ratify an unauthorized assumption by the

Secretary of major policy decisions properly made by Congress;

e.g., here, a foreign corporation's forfeiture of deductions

absent its filing of a timely tax return.[21]  Cf. Estate of

---

[19](...continued)
234, sec. 900(a), (k), 43 Stat. 336, 338, the Court of Appeals
for the Third Circuit has noted that the Board "for all practical
purposes [was] a judicial tribunal operating in the federal
judicial system".  Stern v. Commissioner, 215 F.2d 701, 707-708
(3d Cir. 1954), revg. on other grounds 21 T.C. 155 (1953).

[20] The improper addition to the statute is easily seen by
comparing sec. 882(c)(2) with sec. 1.882-4(a)(2), Income Tax
Regs., as amended in 1990.  The two sections are essentially the
same, except that the regulation includes the word "timely".
Respondent has not explained why sec. 1.882-4(a)(2), Income Tax
Regs., as amended in 1990, stated that a return must be filed
both "timely" and "in the manner prescribed in section F" if, as
he argues, the concept of "time" is subsumed within the statutory
phrase "in the manner prescribed in subtitle F".

[21] Absent a clear expression of legislative intent, we
believe it unreasonable to conclude, as did the Secretary in the
disputed regulations, that Congress intended for a foreign
corporation to forfeit any deduction of its otherwise deductible
ordinary and necessary business expenses simply because it filed
its tax return untimely.  Cf. S. Rept. 1707, 89th Cong., 2d Sess.
26-27 (1966), 1966-2 C.B. 1059, 1076-1077 (noting as to
(continued...)

Applebaum v. Commissioner, 724 F.2d 375, 381-382 (3d Cir. 1983) (Adams, J., concurring), affg. T.C. Memo. 1982-278.  Courts "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute".  NLRB v. Brown, 380 U.S. 278, 291 (1965); accord FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32 (1981).

C.  Application of Natl. Muffler

We also conclude that the Secretary's interpretation of a timely filing requirement is unreasonable under an analysis of the considerations discussed in Natl. Muffler Dealers Association v. United States, 440 U.S. at 477.  That case requires that we take into account the following considerations:  (1) Whether the regulation is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent; (2) the manner in which a regulation dating from a later period evolved; (3) the length of time that the regulation has been in effect; (4) the reliance placed upon the regulation; (5) the consistency of the Secretary's interpretation; and

---

[21](...continued)
nonresident aliens owning property in the United States that their "allocable deductions * * * may be relatively large" and that not allowing such deductions "may result in quite heavy tax burdens").

(6) the degree of scrutiny Congress has devoted to the regulation during subsequent reenactments of the statute.  Id.

Our analysis of these considerations reinforces our conclusion that the disputed regulations are invalid.  The regulations were issued in 1990, 62 years after the relevant text was enacted and 72 years after the enactment of the parallel provision of section 217 of the Revenue Act of 1918.  Thus, the disputed regulations are not a "substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent".  Id. at 477.  We therefore inquire into the manner in which the disputed regulations evolved.  See id. The disputed regulations were issued after both the Court of Appeals for the Fourth Circuit and the Board had repeatedly and consistently held that the relevant text did not include a timely filing requirement.[22]  The regulations also were issued after multiple reenactments of the relevant text, none of which altered the judiciary's construction of the text, and merely adopted respondent's unsuccessful litigating position.  The Secretary's statement accompanying the issuance of the disputed regulations,

---

[22] The relevant meaning that we distill from the referenced cases of the Court of Appeals for the Fourth Circuit and the Board is twofold.  First, a foreign corporation must file a tax return in order to deduct its expenses.  Second, the Commissioner's preparation of a substitute return for the corporation is generally considered to be the corporation's return for Federal income tax purposes and divests the taxpayer of its entitlement to file a return for itself.

"the statute clearly provides for the denial of deductions and credits if returns are not filed in a timely manner", see Preamble of T.D. 8322, 1990-2 C.B. at 172, flies in the face of the judiciary's prior holdings that the relevant text does not include a timely filing requirement and the like interpretation by the ABAST and the other commentators referenced in the preamble to the regulations.[23]  The Secretary's statement is even a departure from his previous interpretation set forth in the 1957 regulations.[24]  The 1957 regulations make no mention of a timely filing requirement but allow a resident foreign corporation to deduct its expenses if it files a true and accurate Federal income tax return in accordance with section 6012 and the regulations thereunder.  We also note as to our analysis under Natl. Muffler Dealers Association v. United States, supra, that the disputed regulations had only been in effect for approximately 3 years as of the first year in issue.

---

[23] In fact, if anything is "clear", it is that the statute does not contain any time requirement and that the Secretary's inclusion of one in the disputed regulations is ultra vires.

[24] Of course, the mere fact that the Secretary has changed his interpretation of a statutory term does not necessarily mean that the latter interpretation is invalid.  See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 863-864; Dickman v. Commissioner, 465 U.S. 330, 343 (1984).  Courts should accord considerably less deference, however, to an agency's statutory interpretation that conflicts with the agency's previous interpretation of the same statute.  See Pauley v. BethEnergy Mines, Inc. 501 U.S. 680, 698 (1991); INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987).

As to the remaining two considerations, i.e., the degree of scrutiny that Congress has devoted to the regulation in question during subsequent reenactments of the statute and the reliance placed on that regulation, these considerations also do not support the Secretary's issuance of the disputed regulations. As to the former, section 882(c)(2) has not been amended since the issuance of the disputed regulations. As to the latter, petitioner obviously did not rely upon the disputed regulations when it filed the subject returns untimely. In fact, the record before us persuades us that petitioner filed those returns relying on the belief that it would be taxed on the same taxable base as that of a domestic corporation (i.e., gross income less deductions). Given the relevant text, its legislative history, the 1957 regulations, and the longstanding judicial precedents, we have no doubt that taxpayers and their advisers would have reasonably concluded immediately before the issuance of the disputed regulations that the relevant text did not include a timely filing requirement and would have reasonably concluded upon the issuance of those regulations that such issuance was an unreasonable attempt by the Secretary to circumvent the firmly established legal terrain.[25] In fact, as to petitioner, it did almost everything that Congress envisioned as to foreign

---

[25] We have found no authority, nor has respondent cited any, to support respondent's position that the relevant text contains a timely filing requirement.

taxpayers and their investment in real property in the United States; petitioner invested in the U.S. real estate and voluntarily filed Federal income tax returns reporting that income net of the expenses related thereto.

For sake of completeness, we also note the legislative reenactment doctrine.  Under that doctrine, Congress is presumed to have known of the administrative and judicial interpretations of a statutory term reenacted without significant change and to have ratified and included that interpretation in the reenacted term.  See Newark Morning Ledger Co. v. United States, 507 U.S. at 574-576; Pierce v. Underwood, 487 U.S. 552, 567 (1988); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381-382 (1982); Lorillard v. Pons, 434 U.S. 575, 580-581 (1978); see also Dresser Indus. v. United States, 238 F.3d 603, 614 (5th Cir. 2001); Kovacs v. Commissioner, 100 T.C. 124, 129-130 (1993), affd. without published opinion 25 F.3d 1048 (6th Cir. 1994); cf. Cannon v. Univ. of Chicago, 441 U.S. 677, 696-697 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law".).  See generally 2A Sands, Sutherland on Statutory Construction § 49.09 (4th ed. 1973), and cases cited therein.  The legislative reenactment doctrine applies with vigor where Congress reenacts statutory text mainly in its entirety, see Dutton v. Wolpoff & Abramson, 5 F.3d 649, 655 (3d Cir. 1993), or where a prior

judicial interpretation of that text has been relied upon and never questioned by the judiciary as of the time of reenactment, see <u>Cannon v. Univ. of Chicago</u>, <u>supra</u> at 696-697 (prior interpretation of a statute "was repeatedly cited with approval and never questioned during the ensuing five years"); see also <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran</u>, <u>supra</u> at 378-379.  In the light of the legislative reenactment doctrine, we presume that Congress upon reenacting the relevant text without significant change as part of the 1939, 1954, and 1986 Codes, as well as part of the Foreign Investors Tax Act of 1966, was mindful of the relevant judicial interpretations and included within the reenacted text the judiciary's interpretation that the text contains no timely filing requirement.[26]  See <u>Dutton v. Wolpoff & Abramson</u>, <u>supra</u> at 655; cf. <u>Kovacs v. Commissioner</u>, <u>supra</u> at 129-130 (concluding by application of the legislative reenactment doctrine that Congress had adopted a prior Board decision when it amended section 104(a)(2) in 1982 and 1989, and when it enacted the Internal Revenue Codes of 1939, 1954, and 1986).

This presumption is further supported by considering the setting of each of the reenactments of the relevant text

---

[26] In fact, respondent concedes that Congress knows of <u>Anglo-Am. Direct Tea Trading Co. v. Commissioner</u>, 38 B.T.A. 711 (1938), and that it is significant that Congress has never amended the relevant text after that case.

following its interpretation by the judiciary.  First, when the relevant text was codified in the 1939 Code, that text had recently been construed in <u>Anglo-Am. Direct Tea Trading Co. v. Commissioner</u>, 38 B.T.A. 711 (1938), a unanimous reviewed opinion of the Board, as including no timely filing requirement.[27] Second, as of each of the times when the text was reenacted in the 1954 Code, the Foreign Investors Tax Act of 1966, and the 1986 Code, <u>Anglo-Am. Direct Tea Trading Co.</u> had been cited repeatedly, favorably, and without reservation by both the Court of Appeals for the Fourth Circuit and the Board.  As of each of those times, the Court of Appeals for the Fourth Circuit also had decided <u>Blenheim Co. v. Commissioner</u>, 125 F.2d 906 (4th Cir. 1942), which confirmed the holding of <u>Anglo-Am. Direct Tea Trading Co.</u> that the relevant text contained no reference to a time element and stated that Congress, in initially enacting the text as part of the Revenue Act of 1928, had adopted a longstanding administrative construction of a parallel provision to the effect that a foreign corporation may deduct its expenses if it files a return before respondent prepares a substitute return for it.  We also note the legislative history underlying the 1954 Code to the effect that Congress did not then believe that a timely filing requirement was included within section 882.

---

[27] The 1939 Code was enacted approximately 4 months after the release of <u>Anglo-Am. Direct Tea Trading Co. v. Commissioner</u>, <u>supra</u>.

While no committee report makes any mention of such a requirement, the House and Senate committee reports both note specifically the "necessity for filing of returns by foreign corporations in order to secure allowance of deductions". See S. Rept. 1622, 83d Cong., 2d Sess., supra at 417; H. Rept. 1337, 83d Cong., 2d Sess., supra at A246. The fact that Congress was keenly aware of the foreign tax provisions when it enacted the 1954 Code also is seen from its inclusion in that act of section 6091(b)(2). That section allowed the Secretary to move all appeals of the issue at hand from the Court of Appeals for the Fourth Circuit, which had decided the issue unfavorably to respondent, to another circuit of his liking.

Third, as part of the Foreign Investors Tax Act of 1966, we note the substantial amendments which Congress made to section 882. In relevant part, Congress added a new section 882(d) that, among other things, allowed a foreign corporation to elect to treat real property income as if it were effectively connected income. A stated purpose of this legislation was to promote foreign investment in real property located in the United States. As an inducement to such foreign investment, Congress intended to allow foreigners to deduct their expenses related to those investments. The disputed regulations work against this intent in that the regulations deny a foreign corporation the taking of its expenses upon the filing of an untimely return, with the

result that the foreign corporation is required to pay taxes on its gross (rather than net) income.  We know of no statutory authority under which any type of taxpayer forfeits an entitlement to deduct substantiated ordinary and necessary business expenses simply because the taxpayer files a tax return untimely.  While respondent proffers section 882(c)(2) as such authority in the case of a foreign corporation, that section does not explicitly support that proffer.

We also bear in mind the Foreign Investors Tax Act of 1966's legislative history, which adds to our understanding that Congress was then mindful of the interpretations set forth in Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra, and its progeny.  The House committee report, for example, refers specifically to "existing law", states that a foreign corporation is entitled to benefit from its deductions "by filing a true and accurate return of its total income", and makes no mention of a timely filing requirement.  See H. Rept. 1450, 89th Cong., 2d Sess., supra at 90.  The Senate committee report likewise makes no mention of a timely filing requirement.  The Senate committee report, on the other hand, does state in a manner consistent with our view that the committee intended for section 882(d) to allow a foreign corporation to treat its real property income as effectively connected income in order to deduct its expenses related to that income.  See S. Rept. 1707, 89th Cong., 2d Sess.,

supra at 19, 1966-2 C.B. at 1071.  The Senate report also expresses Congress's reluctance through the Foreign Investors Tax Act of 1966 to disallow a nonresident alien's deductions related to his or her investment in U.S. real estate because such a disallowance "would tend to discourage foreign investment in U.S. realty".  S. Rept. 1707, 89th Cong., 2d Sess., supra at 26-27, 1966-2 C.B. at 1076-1077.

Respondent acknowledges that the disputed regulations are invalid if the relevant text is unambiguous in including no timely filing requirement.  In contrast to the Secretary's statement in the preamble to the 1990 regulations, respondent argues that the caselaw suggests that the relevant text is ambiguous.  Respondent observes that some of this caselaw states that a foreign corporation must file a "timely" return in order to benefit from its deductions.  Respondent notes especially the court's use of the word "timely" in Blenheim Co. v. Commissioner, supra at 908-910, 912.

We disagree with respondent that the caselaw interprets the relevant text as including the Secretary's timely filing requirement.  In Blenheim Co. v. Commissioner, 125 F.2d 906 (4th Cir. 1942), the Court of Appeals for the Fourth Circuit did state that a foreign corporation must file a "timely" return in order to deduct its expenses; however, the court used the word "timely" to mean that the foreign corporation had to file its return

before respondent prepared a substitute return for it.  The

"timely" reference in that and in the other cases is to such a

"terminal date" found not in the statute but (1) "first adopted

in Taylor Sec. v. Commissioner", 40 B.T.A. 696 (1939), and

(2) subsequently followed in Blenheim Co. v. Commissioner, supra

at 910, and Georday Enters. v. Commissioner, 126 F.2d at 388.[28]

See also Blenheim v. Commissioner, 42 B.T.A at 1251 (preparation

of a substitute return by the Commissioner makes any later return

prepared by the taxpayer a "nullity", which, in turn, means that

the taxpayer's later return is not a "return" within the meaning

of former sec. 233); Taylor Sec., Inc. v. Commissioner, supra at

703 (Board declined to conclude that Congress intended that

delinquent returns filed by a foreign corporation after the

---

[28] Respondent acknowledges that the terminal date in Taylor Sec., Inc. v. Commissioner, 40 B.T.A. 696 (1939), Blenheim Co. v. Commissioner, 125 F.2d 906 (4th Cir. 1942), affg. 42 B.T.A. 1248 (1940), and Georday Enters. v. Commissioner, 126 F.2d 384 (4th Cir. 1942), was the point where the Commissioner prepared a substitute return for the taxpayer.  The Court of Appeals for the Fourth Circuit stated as to this point that it is consistent with, among other things, "the generally accepted rule concerning the number of returns which may be filed."  Blenheim Co. v. Commissioner, supra at 910.  While the court also stated that this point is not an "absolute and rigid rule", we understand that statement to mean that a foreign corporation may in certain cases be entitled to benefit from its deductions where the Commissioner has prepared a substitute return for the corporation.  In fact, had the Court of Appeals for the Fourth Circuit adopted such an "absolute and rigid rule" in Blenheim, its actions would have been inconsistent with its earlier holding in Ardbern Co. v. Commissioner, 120 F.2d 424 (4th Cir. 1941), modifying and remanding 41 B.T.A. 910 (1940), that the foreign corporation was entitled to its deductions even though the Commissioner had filed substitute returns for it.

Commissioner's determination are "returns" within the meaning of former sec. 233). Contrary to respondent's assertion that the Court of Appeals for the Fourth Circuit and the Board construed the statute to impose a timely filing requirement, those tribunals, in referencing the word "timely", were adopting a judicial limitation based on (1) the statute's requirement that a foreign corporation file a tax return in order to deduct its expenses and (2) their conclusion that a foreign corporation could not file such a return if a return had already been prepared for it by the Commissioner.

D. Natl. Cable

In the recent case of Natl. Cable & Telecomm. Association v. Brand X Internet Servs., 545 U.S. ___, 125 S. Ct. 2688 (2005), the Supreme Court decided the validity of a regulation that construed a statute inconsistently with a prior judicial interpretation. The Court held that "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." Id. at 2700. The Court stated: "Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." Id. at 2700.

The Court noted that its decisions in <u>Neal v. United States</u>, 516 U.S. 284 (1996), <u>Lechmere, Inc. v. NLRB</u>, 502 U.S. 527, 536-537 (1992), and <u>Maislin Indus., U.S., Inc. v. Primary Steel, Inc.</u>, 497 U.S. 116, 131 (1990), "allow a court's prior interpretation of a statute to override an agency's interpretation only if the relevant court decision held the statute unambiguous." <u>Natl. Cable & Telecomm. Association v. Brand X Internet Servs.</u>, <u>supra</u> at ___, 125 S. Ct. at 2700.

Given that the Supreme Court has historically reviewed Federal tax regulations primarily under the reasonableness test of <u>Natl. Muffler Dealers Association v. United States</u>, 440 U.S. 472 (1979), the question arises whether <u>Natl. Cable & Telecomm. Association v. Brand X Internet Servs.</u>, <u>supra</u>, which neither cited <u>Natl. Muffler</u> nor involved a Federal tax regulation, applies to Federal tax regulations. We do not decide that question because we conclude that <u>Natl. Cable</u> is distinguishable from this case and, thus, its holding is not controlling here. While we take seriously the Supreme Court's holding in <u>Natl. Cable</u>, we likewise take seriously that Court's discussion of its rationale for, and the context of, that holding. After considering that discussion, and the significant contrasts between that case and the case before us, we are persuaded for numerous reasons that the holding of <u>Natl. Cable</u> does not govern here.

First, the issue in <u>Natl. Cable & Telecomm. Association v. Brand X Internet Servs.</u>, <u>supra</u>, was whether broadband was subject to regulation as a telecommunications service.  Before ruling, the Federal Communications Commission (FCC) had carefully considered technological developments and its own related interpretations.  The Supreme Court's extensive discussion of the FCC's work on its ruling suggests that it was exactly the kind of agency decision that is most entitled to deference.  Here, we find no corresponding record of the Secretary's consideration of whether the relevant text in 1990 included a timely filing requirement; the Secretary's rationale for adopting the disputed regulations is at best perfunctory.

Second, the Supreme Court in <u>Natl. Cable & Telecomm. Association v. Brand X Internet Servs.</u>, <u>supra</u>, noted that the FCC had not previously ruled on the question at hand, but that its ruling regarding broadband was consistent with prior FCC rulings. Here, the Secretary in 1990 directly altered regulations adopted in (and unchanged since) 1957.  Thus, unlike <u>Natl. Cable</u>, the instant case raises questions as to the reasonableness and how much deference applies when the Secretary issues an interpretative regulation that reverses long-settled law.

Third, in <u>Natl. Cable & Telecomm. Association v. Brand X Internet Servs.</u>, <u>supra</u>, the FCC was not a party to <u>AT&T Corp. v. Portland</u>, 216 F.3d. 871 (9th Cir. 2000), the prior case that the

Court of Appeals for the Ninth Circuit had treated as controlling.  Here, the Commissioner was the unsuccessful party in all of the cases holding that timely filing is not required for a foreign corporation to claim its deductions and credits.  In addition, unlike the FCC, the Secretary through the disputed regulations is attempting to overturn the outcome of those cases through his general regulatory authority.

Fourth, AT&T Corp. v. Portland, supra, which the Supreme Court declined to permit to "trump" the FCC ruling, had been decided only approximately 5 years before Natl. Cable & Telecomm. Association v. Brand X Internet Servs., supra.  Here, Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), and its progeny were decided approximately 50 years before the disputed regulations were issued.  Thus, in Natl. Cable the Supreme Court was not faced with the question of whether a longstanding judicial interpretation is entitled to more deference than a recent judicial interpretation.  Nor was that Court faced with the question of the effect of the reenactment of the underlying statute on a prior judicial interpretation.  The case of Natl. Cable also did not involve an agency that was seeking to reverse course from a preexisting, decades old regulatory position that was consistent with judicial precedents of even greater antiquity.

Moreover, apart from the previously mentioned differences, the Court in Natl. Cable & Telecomm. Association v. Brand X Internet Servs., supra, stated that regulatory interpretations do not prevail over a contrary previous judicial interpretation when the judicial tribunal referred to the interpreted statute as unambiguous.  Although the judicial tribunals in Ardbern Co. v. Commissioner, 120 F.2d 424 (4th Cir. 1941), Blenheim Co. v. Commissioner, 125 F.2d 906 (4th Cir. 1942), and Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra, did not state explicitly that they were applying the unambiguous meaning of the word "manner", we believe that they did so, given their analysis and the fact that their interpretation of that word was purely one of statutory construction that resulted from the employment of traditional tools of statutory construction.  "It is emphatically, the province and duty of the judicial department to say what the law is", Marbury v. Madison, 5 U.S. 137, 177 (1803), and "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect", Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.9; see also INS v. Cardoza-Fonseca, 480 U.S. 421, 432 (1987).  Moreover, where "the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved,

not on the basis of matters within the special competence of the * * * [agency], but by judicial application of canons of statutory construction."  Barlow v. Collins, 397 U.S. 159, 166 (1970).  Compare Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., supra at 845 (Supreme Court exercised a very limited review of an agency's regulations after the Court concluded that Congress had left a gap in the statute for the agency to fill), with INS v. Cardoza-Fonseca, supra at 446 (Supreme Court rejected an agency's interpretation of a statute after the Court concluded that the question before it was a "pure question of statutory construction for the courts to decide").

In Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra, the Board was the first judicial body to construe the relevant text.  It construed the meaning of the word "manner" plainly using traditional tools of statutory construction.  The Court of Appeals for the Fourth Circuit performed a similar textual construction in Blenheim Co. v. Commissioner, supra at 908, by simply reading and applying the words of section 233 of the Revenue Act of 1934.[29]  The referenced decisions of the Court of

---

[29] In Ardbern Co. v. Commissioner, 120 F.2d at 426 (4th Cir. 1941), the Court of Appeals for the Fourth Circuit noted that respondent had conceded that the taxpayer would have been entitled to its claimed deductions if the return which the taxpayer had attempted to file with the revenue agent had instead been filed with the Collector at Baltimore.  The court,
(continued...)

Appeals for the Fourth Circuit and the Board turned not on the
need to fill in a gap that Congress left in the statute but on a
matter of pure statutory construction.  Those judicial tribunals
gave effect to the relevant text by reading the text literally
and without reference to any contrary argument that the text was
ambiguous as to the inclusion of a timely filing requirement.
The judicial tribunals' reading of the word "manner" was
consistent with that word's accepted meaning in legislative
practice, as seen from the Board's discussion in Anglo-Am.
Direct Tea Trading Co. of the "structure" of the revenue acts.

Respondent with a citation to his nonacquiscence in
Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra, see
1939-1 C.B. (pt. 1) 39, argues on brief that the holdings in
Anglo-Am. Direct Tea Trading Co. and Ardbern Co. v.
Commissioner, supra, as to the construction of former section
233 are incorrect and invites the Court to disavow those
holdings.  We decline that invitation.  We also disagree with
respondent's argument that the applicability of the rationale of
the court in Ardbern is limited to those cases where a

---

[29](...continued)
therefore, primarily limited its analysis of whether the statute
included a timely filing requirement to the statement of the
Board quoted supra p. 36.  The court did point out, however, that
no provision in the Revenue Act of 1934, ch. 277, 48 Stat. 680,
precluded a late filing taxpayer who filed a return from
receiving the benefit of the deductions to which the taxpayer was
otherwise entitled.  See id. at 426.

compelling equitable consideration is present so as to serve elementary justice.  The Court of Appeals for the Fourth Circuit held specifically in <u>Ardbern Co. v. Commissioner</u>, <u>supra</u> at 426, that former section 233 does not forbid a taxpayer from deducting expenses when the taxpayer files, or attempts in good faith to file, a return claiming those deductions before the Commissioner determines a deficiency against the taxpayer or files a substitute return on the taxpayer's behalf.  Accord <u>Blenheim v. Commissioner</u>, <u>supra</u> at 908 ("It is true that this section [section 233 of the 1928 and 1932 Revenue Acts] contains no reference to a time element.").

XI.  <u>Conclusion</u>

On the basis of the foregoing, we conclude that the disputed regulations are invalid to the extent described herein. Given the plain meaning of the relevant text and the historical setting laid out in detail in this Opinion, including caselaw, legislation, legislative history, and regulations, the Secretary's adoption of a timely filing requirement and his attempted sub silentio overruling of contrary judicial and administrative precedents is unreasonable under <u>Natl. Muffler Dealers Association v. United States</u>, 440 U.S. 472 (1979).[30]

---

[30] We note that this case is strikingly similar to <u>Anglo-Am. Direct Tea Trading Co. v. Commissioner</u>, 38 B.T.A. 711 (1938), where the taxpayer was allowed to receive the benefit of its deductions upon the untimely filing of returns more than

(continued...)

Congress is the legislator in our system of Government and when an interpretation must be made of a tax bill enacted into law, both the judicial and executive branches of Governments, the latter acting through the Treasury Department, may render that interpretation in their own constitutionally permitted ways. As one of those ways, however, it is not reasonable for the Secretary (or anyone else for that matter) to construe a statute's unambiguous meaning in a manner contrary to that intended by Congress in passing the legislation. Such is especially so where, as here, the Secretary attempts to circumvent longstanding judicial decisions that have arrived at the plain meaning of a statute enacted decades before. After the passage of over a half of a century, during which the law on this subject has remained settled and has been relied upon by both taxpayers and the Government alike, it is simply wrong for the Secretary to attempt to resurrect a failed litigating position through the issuance of interpretative regulations.[31]

---

[30](...continued)
18 months after their due date. Indeed, the facts in support of an allowance of deductions are even stronger here. While the taxpayer in Anglo-Am. Direct Tea Trading Co. filed its returns only after respondent discovered that the returns were overdue, petitioner filed its returns before any contact from respondent.

[31] Congress is the only body that may amend the relevant text. Respondent makes no assertion that the Secretary ever asked Congress to amend the text to change the holding of Anglo-Am. Direct Tea Trading Co. v. Commissioner, supra, and its progeny that the text does not include a timely filing

(continued...)

We hold, contrary to respondent's determination, that section 882(c)(2) does not preclude petitioner from deducting the expenses claimed on the subject returns. We have considered all arguments made by the parties as to the manner in which we resolve this case and have found those arguments not discussed herein to be without merit.

<u>Decision will be entered for petitioner</u>.

Reviewed by the Court.

GERBER, COHEN, WELLS, COLVIN, VASQUEZ, GALE, THORNTON, MARVEL, HAINES, GOEKE, WHERRY, and KROUPA, <u>JJ.</u>, agree with this majority opinion.

CHIECHI and FOLEY, <u>JJ.</u>, concur in result only.

---

[31](...continued) requirement. Nor have we found that such was the case. Instead, respondent invites this Court to take a fresh look at the relevant text in the light of the disputed regulations, to reject the judiciary's almost 70-year-old interpretation of that text, and to "incorporate [into the text] the timely filing concept as embodied in the regulation". Respondent asserts that not reading a timely filing requirement into the statute "is administratively unworkable * * * [in that it] would permit foreign taxpayers to live off the U.S. fisc indefinitely, file their returns only when 20-20 hindsight suggests it is in their own best interests to do so, and put the Service at an extreme disadvantage in performing its statutory duties." To say the least, such equitable arguments are made more appropriately to Congress than to the judiciary.

SWIFT, J., dissenting:  For the reasons explained below, I respectfully disagree with the majority opinion.

(1) The majority opinion fails properly to distinguish the pre-1990 "no-regulation environment" of the cited court opinions from the environment or authority that came into existence upon promulgation in 1990 of section 1.882-4(a)(2) and (3)(i) and (ii), Income Tax Regs.

With regard to such a change in the regulatory environment applicable to a particular Federal law question, the Supreme Court recently stated in Natl. Cable & Telecomm. Association v. Brand X Internet Serv., 545 U.S. ___, 125 S. Ct. 2688, 2700 (2005):

> allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute * * * would allow a court's interpretation to override an agency's.  Chevron's premise is that it is for agencies, not courts, to fill statutory gaps. * * * The better rule is to hold judicial interpretations contained in precedents to the same demanding Chevron step one standard that applies if the court is reviewing the agency's construction on a blank slate:  Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction. [Citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-844 n.11 (1984).]

Based on this recent Supreme Court explanation in Natl. Cable & Telecomm. Association of Chevron deference to be given Federal agency regulatory authority, I do not believe that 1930s and 1940s court opinions construing the predecessor of section

882(c)(2) preempted respondent's regulatory authority to promulgate in 1990 a specific administrative rule with regard to section 882(c)(2). See <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843-844 (1984).

In light of <u>Natl. Cable</u>, we should be focusing herein on an analysis of the reasonableness of the filing deadline reflected in section 1.882-4(a)(2) and (3)(i) and (ii), Income Tax Regs., as promulgated in 1990, vis-a-vis the filing deadline reflected in the court opinions that had been extant for approximately 50 years. The majority opinion's analysis, see majority op. pp. 65-69, however, of the reasonableness of the 1990 regulation is quite inadequate.

For the reasons set forth in the discussion below, section 1.882-4(a)(2) and (3)(i) and (ii), Income Tax Regs., constitutes a reasonable administrative rule promulgated by the Commissioner and the Treasury Department and reasonably fills in a gap in the statutory language of section 882(c)(2).

(2) The 1930s and 1940s court opinions adopted and applied a tax return filing deadline to the ability of foreign corporations to qualify for deductions and credits under the predecessor of section 882(c)(2). The court opinions in <u>Taylor Sec., Inc. v. Commissioner</u>, 40 B.T.A. 696 (1939); <u>Ardbern Co. v. Commissioner</u>, 120 F.2d 424 (4th Cir. 1941), modifying and remanding 41 B.T.A. 910 (1940); <u>Blenheim Co. v. Commissioner</u>,

125 F.2d 906 (4th Cir. 1942), affg. 42 B.T.A. 1248 (1940); Georday Enters. v. Commissioner, 126 F.2d 384 (4th Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals, clearly clarified and modified Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), and adopted and applied a tax return filing "deadline", "timely filing date", "cutoff", or "terminal date" (whatever one chooses to call it) to the entitlement of foreign corporations to deductions and credits under the predecessor of section 882(c)(2).

As the Board of Tax Appeals explained in Taylor Sec., Inc. v. Commissioner, supra at 703-704:

> In view of such a specific prerequisite [that foreign corporate taxpayers file tax returns] it is inconceivable that Congress contemplated by that section that taxpayers could wait indefinitely to file returns and eventually when the respondent determined deficiencies against them they could then by filing returns obtain all the benefits to which they would have been entitled if their returns had been timely filed. Such a construction would put a premium on evasion, since a taxpayer would have nothing to lose by not filing a return as required by statute.

In light of the above 1939 clarification by the Board of Tax Appeals to its earlier 1938 opinion arguably to the contrary in Anglo-Am. Direct Tea Trading Co., supra, it is Taylor Sec., Inc., not Anglo-Am., that is to be regarded as the lead pre-regulation court case. See Blenheim Co. v. Commissioner, supra at 910, in which the Court of Appeals for the Fourth Circuit acknowledges that it is Taylor Sec., Inc. that (in spite of the

prior Anglo-Am. opinion) first adopted a foreign corporation tax return "terminal date" or filing deadline (for purposes of allowing deductions and credits to foreign corporations).

Thus, for more than 50 years, prior to 1990 when the regulation in issue herein was promulgated and since the 1939 issuance of the opinion of the Board of Tax Appeals in Taylor Sec., Inc., section 882(c)(2) and its predecessor were interpreted and were held by Federal courts to be unclear and incomplete as to the above corporate filing deadline, and the courts recognized the need for and applied such a deadline.  As the Court of Appeals for the Fourth Circuit stated explicitly in Blenheim Co. v. Commissioner, supra at 908:

> It is true that this section contains no reference to a time element.  Nevertheless, we feel that the so-called normal tax return filed by petitioner on Form 1120 was not a sufficient or timely compliance with Section 233 [the predecessor of section 882(c)(2)] to entitle the petitioner to the deductions claimed therein. * * *

The above "judicially recognized need" for a foreign corporate filing deadline (for purposes of allowing deductions and credits under section 882(c)(2) and its predecessor) provides perhaps the strongest support for the conclusion that the regulation in issue is reasonable (i.e., the regulation simply reflects the attempt by respondent and by the Treasury Department to address via a formally promulgated regulation the

same need the courts addressed in <u>Taylor Sec., Inc. v.</u>
<u>Commissioner</u>, <u>supra</u>, and its progeny).

(3) The majority opinion's description of section 1.882-
4(a)(2) and (3)(i), Income Tax Regs., as simply a reflection of
respondent's "unsuccessful litigating position", majority op.
p. 63, is inaccurate, which inaccuracy perhaps is explained by
the failure of the majority opinion to consider the specifics of
the filing deadline set forth in the regulation.

Although it early on, see majority op. note 4, sets forth
the language of section 1.882-4(a)(3)(i), Income Tax Regs., the
majority opinion provides only two single-sentence, general
explanations of the filing deadline set forth therein, see
majority op. pp. 5, 48, and nowhere does the majority opinion
attempt to compare the filing deadline that was adopted and
applied by <u>Taylor Sec., Inc.</u> and its progeny with the specifics
of the filing deadline set forth in the regulation.

In that regard, the following explanation of the specifics
of the filing deadline set forth in section 1.882-4(a)(2) and
(3)(i), Income Tax Regs., may be helpful.

Section 1.882-4(a)(2) and the first sentence of (3)(i),
Income Tax Regs., explains that the "timely filing" deadline set
forth therein applies only in determining a foreign
corporation's entitlement to deductions and credits under
section 882(c)(2).  It does not constitute a generic timely

filing deadline that applies to foreign corporations under other provisions of the Code. For example, the timely filing deadline of the above regulation does not apply for purposes of section 6072(c).

Section 1.882-4(a)(3)(i), Income Tax Regs., then proceeds, for purposes of allowing deductions and credits under section 882(c)(2) for a current taxable year, to divide foreign corporations required to file Federal tax returns into two categories: First, those that for the prior taxable year filed an income tax return (and those for which the current taxable year is the taxpayers' first taxable year for which a Federal tax return is required) (category 1 corporation) and, second, those that for the prior taxable year were required to but did not file a Federal tax return (category 2 corporation).

For purposes of allowing deductions and credits under section 882(c)(2) for the current year, section 1.882-4(a)(3)(i), Income Tax Regs., provides that for a category 1 corporation (prior year tax return filed or first year tax return required) the filing deadline for the current taxable year is a fixed 18 months after the due date for the current year tax return. Where, prior to the filing by a category 1 corporation of its current year tax return within this 18-month period, respondent notifies the corporation (that no tax return has been filed for the current year and that no deductions or

credits under section 882(c)(2) will be allowed), the 18-month filing deadline set forth in the regulation represents a lengthening of the return filing deadline that would have applied under Taylor Sec., Inc. v. Commissioner, 40 B.T.A. 696 (1939), and its progeny (under which respondent's prior notification would have established the deadline).

Where a category 1 corporation files its tax return for the current year after the 18-month period, but before respondent notifies the taxpayer, the fixed 18-month filing deadline of the regulation would apply, and the regulation represents a shortening of the filing deadline that would have applied under Taylor Sec., Inc. and its progeny.

For purposes of allowing the deductions and credits under section 882(c)(2) for the current year for a category 2 corporation (tax return for the prior year not filed), section 1.882-4(a)(3)(i), Income Tax Regs., provides that a foreign corporation must file its tax return for the current year before the earlier of either respondent's notification to the corporation (that no tax return has been filed for the current year and that no deductions or credits under section 882(c)(2) will be allowed) or 18 months after the due date for the current year tax return.  Where respondent so notifies a category 2 corporation within the specified 18-month period, this filing

deadline constitutes the same filing deadline as would have applied under Taylor Sec., Inc. and its progeny.

For a category 2 corporation that files its tax return after the 18-month period but before respondent notifies the taxpayer, the 18-month filing deadline of the regulation would apply, and the regulation represents a shortening of the filing deadline that would have applied under Taylor Sec., Inc. and its progeny.

In effect, the filing deadline set forth in section 1.882-4(a)(3)(i), Income Tax Regs., significantly incorporates and reflects aspects of the filing deadline of Taylor Sec., Inc. and its progeny, but it shortens that deadline to no later than 18 months after the due date of the current year tax return, and it lengthens that deadline to 18 months after the tax return due date for a foreign corporation that filed a tax return for the prior year and that received notification from respondent prior to filing its tax return.[1]

As is evident, contrary to the majority opinion's contention that section 1.882-4(a)(2) and (3)(i), Income Tax

---

[1] I regard the notification to foreign corporations described in sec. 1.882-4(a)(3)(i), Income Tax Regs. (that no tax return has been filed for the current year and that no deductions or credits under sec. 882(c)(2) will be allowed), as not materially different from the notification mentioned in Taylor Sec., Inc. v. Commissioner, 40 B.T.A. 696 (1939), and its progeny (that respondent has prepared a substitute tax return or issued a notice of deficiency in which a corporation's deductions and credits under sec. 882(c)(2) were not allowed).

Regs., "simply adopts respondent's unsuccessful litigating position", majority op. p. 63, or seeks to "resurrect * * * [respondent's] failed litigating position", majority op. p. 84, the regulation in issue incorporates significant aspects of the judicially crafted filing deadline that was in effect for many years prior to 1990.

It would seem obvious that the increased number of foreign corporation Federal income tax returns filed with respondent in today's world (as distinguished from the 1930s when the cases relied on by the majority opinion were decided) and the increasingly complex tax laws and tax administration applicable thereto would support, per se, respondent's effort, by properly promulgated regulation, to modify and clarify, in the above modest manner, the return filing deadline that has been applicable to foreign corporations.

Further, it is appropriate to emphasize that the regulation at issue herein provides in subdivision (ii) of section 1.882-4(a)(3), Income Tax Regs., a good cause, facts and circumstances exception to the return filing deadline otherwise applicable under section 1.882-4(a)(3)(i), Income Tax Regs.  This aspect of the 1990 regulation is consistent with the facts and circumstances filing deadline that was applied by the Court of Appeals for the Fourth Circuit in Ardbern Co. v. Commissioner, 120 F.2d 424 (4th Cir. 1941).

Lastly on this point, in 1938 respondent's litigating position in <u>Anglo-Am. Direct Tea Trading Co. v. Commissioner</u>, 38 B.T.A. 711 (1938), was that the return filing deadline for purposes of the predecessor of section 882(c)(2) was the same as the statutory due date for filing foreign corporation tax returns. By 1941, if not earlier, respondent's litigating position had changed, and respondent was conceding that foreign corporation tax returns filed late but before respondent's notification to foreign corporations would be considered timely under the predecessor of section 882(c)(2). See <u>Ardbern Co. v. Commissioner</u>, <u>supra</u> at 426.

In summary on this point, the filing deadline reflected in section 1.882-4(a)(3)(i) and (ii), Income Tax Regs., incorporates significant aspects of the judicially crafted foreign corporation tax return filing deadline and is quite different from respondent's original litigating position in 1938 in <u>Anglo-Am. Direct Tea Trading Co.</u>

(4) The majority opinion, see majority op. p. 77, suggests that section 1.882-4(a)(2) and (3)(i), Income Tax Regs., is inconsistent with the Treasury regulation promulgated in 1957; namely, sec. 1.882-4, Income Tax Regs. To the contrary, the 1957 regulation was silent as to any tax return filing deadline under section 882(c)(2); just as section 882(c)(2) is silent still today as to any such deadline. Section 1.882-4(a)(2) and

(3)(i) and (ii), Income Tax Regs., thus fills a gap not only in the language of section 882(c)(2), but also in the language of the 1957 regulation; just as Taylor Sec., Inc. and its progeny filled a gap in the language of the predecessor of section 882(c)(2).

(5) In its discussion of the legislative reenactment doctrine, see majority op. pp. 69-74, the majority opinion ignores a significant limitation on the legislative reenactment doctrine as follows:

> [The legislative reenactment doctrine] does not apply where nothing indicates that the legislature had its attention directed to the administrative interpretation upon reenactment. [2B Singer, Sutherland Statutory Construction § 49:09 (6th ed. 2000).]

In this case, in reenacting section 882(c)(2) and its predecessor, no evidence indicates that Congress had "its attention directed" to any of the 1930s and 1940s court opinions involving a deadline for foreign corporations to file their tax returns in order to preserve deductions and credits under the predecessor of section 882(c)(2).  Absent such evidence, any application herein of the legislative reenactment doctrine would be inappropriate.[2]

---

[2]  A vague statement in one of respondent's briefs that Congress "was aware of" the early Board of Tax Appeals and other court opinions is puzzling and ambiguous.

As the Court of Appeals for the Seventh Circuit explained in <u>Bell Fed. Sav. & Loan Association v. Commissioner</u>, 40 F.3d 224, 230 (7th Cir. 1994), revg. T.C. Memo. 1991-368:

> However, neither * * * [the taxpayer] nor the tax court has pointed to any occasion when Congress even mentioned the old--or new--regulation.  This fact is important to the workings of the re-enactment doctrine for a relevant factor in a court's review is "the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute." * * * [Citing <u>National Muffler Dealers Assoc., Inc. v. United States</u>, 440 U.S. 472, 477 (1979).] The regulations and statutes involved in this area are too complex for us to venture to assume Congress's intent through its silence.  Therefore, we choose to not second-guess the Treasury on this matter.  The Sixth Circuit was correct when it stated:
>
>> The re-enactment doctrine is merely an interpretive tool fashioned by the courts for their own use in construing ambiguous legislation.  It is most useful in situations where there is some indication that Congress noted or considered the regulations in effect at the time of its action.  Otherwise, the doctrine may be as doubtful as the silence of the statutes and legislative history to which it is applied. * * * [Quoting <u>Peoples Fed. Sav. & Loan Association v. Commissioner</u>, 948 F.2d 289, 302-303 (6th Cir. 1991), revg. T.C. Memo. 1990-129.]

We also have applied this particular limitation to the legislative reenactment doctrine.  In <u>Ashland Oil, Inc. v. Commissioner</u>, 95 T.C. 348, 363 (1990),[3] we refused to apply the

---

[3]  We also have stated that, "we do not believe that the legislative reenactment doctrine can be applied to bar reasonable amendments to regulations where * * * the change is made only prospectively from the date of the announcement of the proposed change."  <u>Wendland v. Commissioner</u>, 79 T.C. 355, 384 (1982), affd. sub nom. <u>Redhouse v. Commissioner</u>, 728 F.2d 1249 (9th Cir.
(continued...)

legislative reenactment doctrine to a revenue ruling because "Without affirmative indications of congressional awareness and consideration, we decline to cloak this revenue ruling with the aura of legislative approval."

(6) Finally, rather than expressing sympathy for petitioner, see majority op. pp. 68, 72-74, whose Federal income tax returns were due on November 15 of each year, the fact that petitioner filed each of its 1993, 1994, 1995, and 1996 Federal corporate income tax returns on July 23, 1999, some 2-5 years after the return due dates and 9 years after section 1.882-4(a)(2) and (3)(i), Income Tax Regs., was promulgated is hardly indicative of a foreign corporation seeking to comply with U.S. tax laws.

In conclusion, it is not respondent herein who is attempting to resurrect anything, see majority op. p. 84. Rather, it is the majority opinion that would resurrect Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), and that would ignore later Board of Tax Appeals and Court of Appeals opinions and litigation that concluded that the statutory language of the predecessor of section 882(c)(2) was incomplete and ambiguous and necessitated the adoption and

---

[3](...continued)
1984).  Note the prospective only effective date of the regulation at issue herein, for taxable years ending after July 31, 1990.  Sec. 1.882-4(a)(3)(i), Income Tax Regs.

application by the courts of a foreign corporation filing deadline for purposes of the predecessor of section 882(c)(2).

Section 1.882-4(a)(2) and (3)(i) and (ii), Income Tax Regs., reflects the Commissioner's and the Secretary's consistent and similar conclusion. The specific foreign corporation tax return filing deadline that is reflected in the regulation incorporates aspects of the judicially crafted deadline, is flexible to take into account unusual situations, but also is modestly tightened up to reflect updated tax administration concerns relating to foreign corporate tax compliance.

For the reasons stated, I respectfully dissent from this Opinion which invalidates section 1.882-4(a)(2) and (3)(i), Income Tax Regs.

HOLMES, J., agrees with this dissenting opinion.

HALPERN, J., dissenting:

I. Introduction

This case involves the deference (if any) that we must show the Secretary of the Treasury's (Secretary's) construction of the Internal Revenue Code. The majority holds that we need show no deference to the Secretary's construction found in section 1.882-4(a)(2) and (3)(i), Income Tax Regs., imposing a timely filing requirement on foreign corporations. It holds the regulation to be invalid. I disagree.

In Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984), the Supreme Court set forth a sequential approach for determining whether an agency's construction of a statute it administers should be given deference:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. * * * [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. (fn. ref. omitted). That approach was reaffirmed by the Supreme Court in Atl. Mut. Ins. Co. v. Commissioner, 523 U.S. 382, 389 (1998) (a case involving the validity of an income tax regulation), in which, with respect to the second question, the Court added the admonition: "[T]he task that confronts us is to

decide, not whether the Treasury Regulation represents the best interpretation of the statute, but whether it represents a reasonable one.  See <u>Cottage Savings Assn. v. Commissioner</u>, 499 U.S. 554, 560-561 (1991)."

Accordingly, the questions in the instant case are: (1) Whether, in denying a foreign corporation an allowance for deductions and credits (without distinction, deductions) unless the foreign corporation files a true and accurate income tax return within the time limits set forth in section 1.882-4(a)(2) and (3)(i), Income Tax Regs., the Secretary has contradicted the unambiguously expressed intent of Congress; and, if that cannot be said, (2) whether the time limits imposed by the Secretary constitute a permissible construction of section 882(c)(2).

Before proceeding, it may be helpful to establish some terminology regarding the time for filing returns.  I find the majority's use of the term "timely" confusing.  For example, on page 4 of its report, the majority uses the term "timely" to mean both a return filed on or before the due date established by section 6072 (see note 3) and a return filed after the due date but before the "arbitrary 18-month deadline * * * devised by the Secretary."  I use the term "on-time" to describe a return filed on or before the date established by the relevant provision of a statute and the term "timely" to describe a return filed after that date but before some date after which

the filing would be considered untimely (e.g., the "terminal date" described by the Court of Appeals for the Fourth Circuit in Blenheim Co. v. Commissioner, 125 F.2d 906, 910 (4th Cir. 1942), affg. 42 B.T.A. 1248 (1940)).

II.  First Question:  Has Congress Directly Spoken to the Precise Question at Issue?

If a foreign corporation files its income tax return on or before the due date prescribed in section 6072(c), the return is on-time.  Moreover, no provision of subtitle F deprives a foreign corporation of the benefit of deductions claimed on a return simply because the return was not on-time.  Indeed, in Anglo-Am. Direct Tea Trading Co. v. Commissioner, 38 B.T.A. 711 (1938), our predecessor, the Board of Tax Appeals (the Board), held that section 233 of the Revenue Act of 1928, ch. 852, 45 Stat. 849 (a precursor to section 882(c)(2)), could not be read to make an on-time return a prerequisite to a foreign corporation's having the benefit of deductions to which it was otherwise entitled:  "[I]f Congress had intended to deprive a foreign corporation of its right to * * * [a deduction] if it did not file its return within the time prescribed, we think it would have said so."  Id. at 715 (emphasis added).  Thereafter, however, both the Board and the Court of Appeals for the Fourth Circuit acknowledged that the allowance of deductions to a foreign corporation was a privilege, which should be terminated at some point to assure the proper administration of the income

tax.  Georday Enters. v. Commissioner, 126 F.2d 384, 388 (4th Cir. 1942), affg. a B.T.A. Memorandum Opinion; Blenheim Co. v. Commissioner, supra at 909-910; Ardbern Co. v. Commissioner, 120 F.2d 424 (4th Cir. 1941), modifying and remanding 41 B.T.A. 910 (1940); Taylor Sec., Inc. v. Commissioner, 40 B.T.A. 696, 703 (1939).

In Blenheim Co. v. Commissioner, supra at 908, the Court of Appeals did state that section 233 of the Revenue Act of 1934, ch. 277, 48 Stat. 737, "contains no reference to a time element."  It found, however, that the return filed by the taxpayer was "[n]evertheless * * * not a sufficient or timely compliance with Section 233 to entitle the petitioner to the deductions claimed therein."  Id. (emphasis added).  It held that, in subjecting foreign corporations to section 233 of the 1934 Act, "Congress conditioned its grant of deductions upon the timely filing of true, proper and complete returns."  Id. at 909 (emphasis added).

In Taylor Sec., Inc. v. Commissioner, supra, the Board concluded that, once the Commissioner determined a deficiency in tax, a taxpayer could not avoid the effect of section 233 by thereafter filing a return.  The Board stated:

> [W]e are unable to conclude that in enacting section 233 * * * it was the intention of Congress that delinquent returns filed by a foreign corporation after the respondent's determination should constitute the returns required as a prerequisite to the allowance of the credits and deductions ordinarily

allowable to the corporations. * * * In view of such a specific prerequisite it is inconceivable that Congress contemplated by that section that taxpayers could wait indefinitely to file returns and eventually when the respondent determined deficiencies against them they could then by filing returns obtain all the benefits to which they would have been entitled if their returns had been timely filed. Such a construction would put a premium on evasion, since a taxpayer would have nothing to lose by not filing a return as required by statute.

Id. at 703-704.

More recently, in Espinosa v. Commissioner, 107 T.C. 146 (1996), the issue was whether untimely returns filed by a nonresident alien individual were sufficient to avoid the disallowance of deductions under section 874(a) (which contains language virtually identical to the language in question in section 882(c)(2)). We upheld the disallowance of deductions under section 874(a), concluding:

[W]hile sections 874(a) and 882(c)(2) contain no explicit time limit, the policy behind these provisions, as applied by the case law, dictates that there is a cut-off point or terminal date after which it is too late to submit a tax return and claim the benefit of deductions. If no cut-off point existed, taxpayers would have an indefinite time to file a return, and these provisions would be rendered meaningless. * * *

Id. at 157 (emphasis added).

As the above discussion suggests, no case has said that section 822(c)(2) does not (or its precursors did not) make timely filing a prerequisite to receiving the benefit of deductions. Nor does the body of cases discussing section

822(c)(2) and its precursors provide guidance of general applicability concerning timeliness; it merely resolves issues created by unique fact patterns on a case-by-case basis. Although those cases do not unambiguously establish the limits of timeliness, they clearly establish that timely filing is required. Those cases treat section 882(c)(2) as if it were incomplete: Timeliness is required, but timeliness is not defined. Timeliness is anchored by section 6072 to the date required for filing the return, but neither section 882(c)(2) nor any other provision of the Code tells us when the line runs out. This case does not involve the question of whether a line can be drawn to enforce section 882(c)(2); that has already been decided in the affirmative. This case involves the question of who gets to draw the line: the courts or the Secretary? The clearly expressed intent of Congress to the contrary not being apparent, the Secretary is not deprived of his authority under section 7805(a) to draw that line (i.e., to establish needful rules and regulations for the enforcement of section 882(c)(2)).

III. <u>Second Question:  Is the Secretary's Regulation Based on a Permissible Construction of the Statute</u>?

Having reached the second step in our sequential analysis, the question that we must answer is whether the timely filing rule found in section 1.882-4(a)(2) and (3)(i), Income Tax Regs., is based on a permissible construction of the statute.

In Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843-844, the Supreme Court said:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. [Fn. refs. omitted.]

Section 882(c)(2) does not specifically make the allowance of deductions to a foreign corporation contingent on a timely filed return, nor does it grant the Secretary express authority to prescribe regulations defining timeliness for purposes of section 882(c). In promulgating section 1.882-4(a)(2) and (3)(i), Income Tax Regs., the Secretary exercised his rulemaking authority under section 7805(a), which gives the Secretary general authority to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. See T.D. 8322, 1990-2 C.B. 172.[1] The appropriate standard for

---

[1] In Boeing Co. v. United States, 537 U.S. 437, 448 (2003), the Supreme Court said of another Treasury regulation issued under the authority of sec. 7805(a): "Even if we regard the challenged regulation [sec. 1.861-8(e)(3) (1979), Income Tax Regs.] as interpretive because it was promulgated under § 7805(a)'s general rulemaking grant rather than pursuant to a specific grant of authority, we must still treat the regulation with deference. See Cottage Savings Assn. v. Commissioner, 499 U.S. 554, 560-561 (1991)."

determining whether section 1.882-4(a)(2) and (3)(i), Income Tax Regs., is based on a permissible construction of section 882(c)(2) is whether it represents a "reasonable" interpretation of that section. See Atl. Mut. Ins. Co. v. Commissioner, 523 U.S. at 389.[2]

To be more specific, we must determine whether the 18-month limitation found in section 1.882-4(a)(3), Income Tax Regs., is reasonable, since the otherwise applicable filing limitation found in section 1.882-4(a)(2) and (3)(i), Income Tax Regs., construes the statute in a similar (indeed, in a more generous) manner than the courts have construed it. See Judge Swift's dissent p. 90. I have already quoted our report in Espinosa v. Commissioner, supra, to the effect that the policy behind section 882(c)(2) implies a cutoff point or terminal date after which it is too late to submit a tax return and claim the benefit of deductions. The question is thus one of line drawing, and the majority has failed to convince me that the line drawn by the Secretary is unreasonable. Judges Holmes and Swift have adequately dealt with the majority's conclusion to the contrary, and I have nothing to add. I also fully join

---

[2] I am not ready to join Judge Holmes in concluding that, in United States v. Mead Corp., 533 U.S. 218 (2001), the Supreme Court "clarified the law, by conflating the standard of 'reasonableness' with the standard of 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Judge Holmes's dissent p. 141.

Judge Holmes's criticism of the majority's distinction of <u>Natl. Cable & Telecomm. Association. v. Brand X Internet Servs.</u>, 545 U.S. __, 125 S. Ct. 2688 (2005).  Since we are faced here with a question of line drawing, the Secretary's reasonably drawn line necessarily supersedes the line drawn by any court.  See <u>Natl. Cable & Telecomm. Association</u>, <u>supra</u> at 2700.

IV.  <u>Conclusion</u>

For the reasons stated, I would uphold section 1.882-4(a)(2) and (3)(i), Income Tax Regs., as a reasonable exercise of the Secretary's authority under section 7805(a) to draw lines.

SWIFT, <u>J</u>., agrees with this dissenting opinion.

HOLMES, J., dissenting:  The issue in this case is easy to understand.  Section 882(c)(2) denies foreign corporations that have U.S. income the benefit of the deductions and tax credits they would otherwise get if they fail to file returns "in the manner prescribed by subtitle F."  Section 6072--which is part of the Code's subtitle F--imposes a time limit for filing foreign corporate returns.  Before 1990, courts had construed the phrase in section 882(c)(2)--"in the manner prescribed by subtitle F"--as meaning neither "foreign corporations must file their returns by the deadline set in section 6072" nor "foreign corporations have till the end of time to file," but rather that "foreign corporations have only until the Secretary, after a reasonable time, prepares a substitute return."  The regulation that we invalidate today replaced the old "reasonable time standard" with an 18-month grace period[1] beyond section 6072's deadline, and replaced the preparation of a substitute return with a written notice.  The 18-month grace period might be shorter or longer than the old judicially-constructed one.  It is undeniably more definite.

---

[1] As Judge Swift carefully explains, see dissent *supra* pp. 90-93, the disputed regulation is fairly complex and establishes a number of exceptions to the general 18-month rule; for simplicity's sake, I refer to the regulation as creating an 18-month grace period.

Upholding this regulation should be almost trivially easy. "So long as the Commissioner issues regulations that 'implement the congressional mandate in some reasonable manner,' * * * we must defer to the Commissioner's interpretation. Only if the code has a meaning that is clear, unambiguous, and in conflict with a regulation does a court have the authority to reject the Commissioner's reasoned interpretation and invalidate the regulation." Redlark v. Commissioner, 141 F.3d 936, 939 (9th Cir. 1998), revg. 106 T.C. 31 (1996). For the Secretary to issue a regulation giving a clear 18-month grace period doesn't contradict anything in the Code, at least anything clearly and unambiguously in the Code.[2]

_____

[2] Our Court has met with limited success in finding regulations unreasonable after the extensive review of the sort we do today. See Pac. First Fed. Sav. Bank v. Commissioner, 94 T.C. 101 (1990) (invalidating sec. 1.593-6(b)(1)(iv), Income Tax Regs. after plenary review of statute and legislative history), revd. 961 F.2d 800, 805 (9th Cir. 1992) ("we cannot usurp the Treasury's authority and invalidate the regulation unless it is an unreasonable construction"), disagreed with by Peoples Fed. S&L v. Commissioner, 948 F.2d 289, 300 (6th Cir. 1991) ("a court may not substitute its own construction for the reasonable interpretation of an agency"), disagreed with again by Bell Fed. Sav. & Loan Association v. Commissioner, 40 F.3d 224,227 (7th Cir. 1994), revg. T.C. Memo. 1991-368 ("choice among reasonable interpretations is for the Commissioner, not the courts"), and finally abrogated, Cent. Pa. Sav. Association & Subs. v. Commissioner, 104 T.C. 384 (1995); see also Redlark v. Commissioner, 106 T.C. 31 (1996) (invalidating sec. 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987) after plenary review of statute and legislative history), revd. 141 F.3d 936 (9th Cir. 1998) (using language quoted in text above), disagreed with by Allen v. United States,
(continued...)

I respectfully dissent, because today's opinion lays down new and misleading trails through three different parts of the jungle of administrative law:

!    It misapplies the plain meaning rule;

!    It greatly extends the doctrine of legislative reenactment to overturn a regulation; and

!    It rejects the recent teaching of the Supreme Court in Brand-X[3] on the necessity of deferring to an administrative agency's decision to issue a regulation overturning caselaw.

I also write separately to highlight what I think is a serious confusion in the appropriate way we should review regulations that have gone through notice-and-comment rulemaking, especially those that change existing law.  Much of the majority's exhaustive recitation of the history of section 882 and its regulation arises from the different factors that we

---

[2](...continued)
173 F.3d 533 (4th Cir. 1999) (regulation need not be "best possible means of implementing the statute" if it's reasonable), and disagreed again with Kikalos v. Commissioner, 190 F.3d 791, 796-797 (7th Cir. 1999), revg. T.C. Memo. 1998-92 ("[i]t is not our role to determine the most appropriate interpretation of the statute, but simply to assess whether the regulation reflects a reasonable construction"), and finally abrogated, Robinson v. Commissioner, 119 T.C. 44 (2002).

[3] Natl. Cable & Telecomm. Assn. v. Brand X Internet Servs., 546 U.S. ___, 125 S. Ct. 2688 (2005).

use in applying <u>National Muffler</u>[4] compared to <u>Chevron</u>.[5]  This
case may therefore be a good vehicle for appellate guidance on
whether <u>National Muffler</u> continues to be in good working order
after <u>Chevron</u>, <u>Mead</u>,[6] and <u>Brand X</u>.

I.

The majority begins its analysis, as I agree we should,
with the question of whether section 882's phrase "in the manner
prescribed by subtitle F" has an unambiguous meaning.  Whether
<u>National Muffler</u> or <u>Chevron</u> applies, there is no doubt that if
Congress has spoken on the issue, no regulation in conflict can
survive.  "If the intent of Congress is clear, that is the end
of the matter; for the court, as well as the agency, must give
effect to the unambiguously expressed intent of Congress."
<u>Chevron</u>, 467 U.S. at 842-843; see also <u>National Muffler</u>, 440
U.S. at 476.

But what materials should a court look at to decide whether
a statutory phrase is unambiguous?  The answer is in <u>Natl. R.R.
Passenger Corp. v. Boston & Maine Corp.</u>, 503 U.S. 407, 417
(1992) (citations omitted):  "a court must look to the structure

_____

[4] <u>National Muffler Dealers Assn., Inc., v. United States</u>,
440 U.S. 472 (1979).

[5] <u>Chevron U.S.A., Inc., v. Natural Resources Defense
Council, Inc.</u>, 467 U.S. 837 (1984).

[6] <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001).

and language of the statute as a whole.  If the text is
ambiguous and so open to interpretation in some respects, a
degree of deference is granted to the agency."[7]

The majority crane their necks away from the actual words
of section 882 and its place in the Code to look at whether the
regulation "adopts respondent's unsuccessful litigating
position, with total disregard for judicial precedent," majority
op. p. 63, and at the legislative reenactment doctrine, majority
op. p. 62 note 18.  As I discuss later on, these factors are
only relevant, if at all, in reviewing a regulation based on a
text that we've already found to be ambiguous.  The majority's
strongest point, though, is their cataloging of the various
times in the Code where a phrase like "at the time and in the
manner prescribed" appears.  The absence of the first part of
the phrase, they reason, means that the second part--"in the
manner prescribed" has no "time element" because Congress must

---

[7] Whether a court should look to the text alone in deciding
if a statute is ambiguous, as in Natl. R.R. Passenger, or to the
text plus legislative history, as Chevron implies, see Chevron,
467 U.S. at 842, is a matter of some controversy.  See Coke v.
Long Island Care at Home, Ltd., 376 F.3d 118, 127 n.2 (2d Cir.
2004) (collecting cases); see also Tax Analysts v. Commissioner,
350 F.3d 100, 103-104 (D.C. Cir. 2003); Hosp. Corp. of America &
Subs. v. Commissioner, 348 F.3d 136, 144 (6th Cir. 2003) affg.
107 T.C. 73 (1996).  It doesn't matter in this case because the
legislative history of section 882 shows no congressional intent
one way or the other about when a foreign corporation must file
its return to avoid loss of deductions.  See infra p. 122.

have known what it was doing when it included "manner" and left out "time". Majority op. pp. 58-60. They conclude:

> We understand that use [i.e., of the word "manner"] to refer to items of information and not to refer to the time for the filing of a return or the furnishing of any other document. We conclude that Congress, by using only the word "manner" in section 882(c)(2), did not intend to include in that provision any element of time.* * *

Majority op. pp. 61-62.[8]

This was also more or less the reasoning of our predecessor, the Board of Tax Appeals, in <u>Anglo-Am. Direct Tea Trading Co. v. Commissioner</u>, 38 B.T.A. 711 (1938). But there are at least two problems with this reasoning. The first is that, as is usually the case with a statute as old and overgrown as the Code, there are counterexamples of the use of the word "manner." Consider, for example, section 179(c). This section gives small businesses the option of expensing capital purchases. Such an election "shall be made in such manner as the Secretary may by regulations prescribe." He prescribed such

---

[8] The Code governs the "place" of filing returns as well as their "time" and "manner." Part VII of subtitle F has detailed rules, which the IRS has supplemented with extensive regulations. Treas. Regs. 1.6091-1, 20.6091-1, 25.6091-1, 31.6091-1, 40.6091-1, 41.6091-1, 44.6091-1, 53.6091-1, 55.6091-1, 156.6091-1, 157.6091-1T, 301.6091-1, 1.6091-2, 1.6091-3, 1.6091-4. Given today's narrow reading of "manner prescribed under subtitle F," we may someday have to decide whether a return that a foreign corporation intentionally sends astray could trigger a loss of deductions.

a regulation, sec. 1.179-5(a), Income Tax Regs., and it restricts the time in which a taxpayer can make this election, given the practical needs of a tax system based on periodic returns.  The same is true of elections by a reciprocal insurer under section 835(c)(2), which requires a consent "in such manner as the Secretary shall prescribe."  The Secretary prescribed the manner in a regulation, which again requires filing of such consents by a particular time.  See sec. 1.826-1(c), Income Tax Regs.

This is hardly surprising.  While I agree that we should always construe the words of a statute to have their original public meaning, it is also true that we can--indeed, we should--recognize that even tax statutes are written against a background of common law legal usage.  And it is generally the case that when a legal instrument omits explicit time limits to do something permitted or required, it does not ordinarily mean that there are no time limits at all.  See 1 Restatement, Contracts 2d, sec. 41 (1981); 1 Corbin, Corbin on Contracts, sec. 2.16 at 203 (1993) ("[i]f the offeror has not communicated a specific time limit with sufficient definiteness, the power of acceptance by the offeree continues for a reasonable time * * * [w]hat is a reasonable time, in any case, is a question of fact to be determined by a consideration of all the circumstances existing when the offer [is made]"); e.g., Staples v. Pan-Am.

Wall Paper & Paint Co., 63 F.2d 701, 702 (3d Cir. 1933) (as offer "contained no time limitation for acceptance, it was incumbent upon the plaintiff to accept within a reasonable time"); Minneapolis & St. Louis R.R. Co. v. Columbus Rolling-Mill Co., 119 U.S. 149, 151 (1886) ("[i]f the offer does not limit the time for its acceptance, it must be accepted within a reasonable time").

I'm not saying that we need to canvass contract law to construe the Code, only suggesting that the observation that Congress used the word "manner" without specifying "time" is not the end of the argument. The context in which the word occurs suggests that imputation of a reasonable time limit is not a departure from the ordinary legal meaning of the word--any more than imputation of a reasonable delivery time in a contract for delivery of specified goods, 1 Restatement, Contracts 2d sec. 33 (1981), or imputation of a reasonable time for closing a conveyance of property, 1 Restatement, Property (Mortgages) 3d sec. 7.2 (1997) would be. And before today, I knew of no place in the Code where a Court has held that "manner" without "time" means "anytime at all."

The reason for imputing some time limits on filing returns or making elections is one of practical necessity. And this is where the majority's invocation of Anglo-American is so unintentionally radical, because the second problem with its

discussion of the plain meaning of "manner" is that it misunderstands the import of the many opinions from the 1930s and 1940s that in effect *did* set a filing deadline for foreign corporations if they wanted to qualify for deductions and other credits. The BTA's opinion in <u>Taylor Securities Inc. v. Commissioner</u>, 40 B.T.A. 696 (1939), and the opinions of the Fourth Circuit in <u>Ardbern Co. v. Commissioner</u>, 120 F.2d 424 (4th Cir. 1941), modifying and remanding 41 B.T.A. 910 (1940); <u>Blenheim Co. v. Commissioner</u>, 125 F.2d 906 (4th Cir. 1942), affg. 42 B.T.A. 1248 (1940); and <u>Georday Enterprises v. Commissioner</u>, 126 F.2d 384 (4th Cir. 1942), all disagreed with a reading of <u>Anglo-American</u> as disallowing *any* limits on late filing.

As the Board of Tax Appeals explained in <u>Taylor Securities</u>:

> In view of such a specific prerequisite [that foreign corporate taxpayers file tax returns] it is inconceivable that Congress contemplated by that section that taxpayers could wait indefinitely to file returns and eventually when the respondent determined deficiencies against them they could then by filing returns obtain all the benefits to which they would have been entitled if their returns had been timely filed. Such a construction would put a premium on evasion, since a taxpayer would have nothing to lose by not filing a return as required by statute.

40 B.T.A. at 703-04.

The Fourth Circuit recognized long ago that <u>Taylor Securities</u> was an innovation. <u>Blenheim</u>, 125 F.2d at 910. It is

therefore <u>Taylor Securities</u>, not <u>Anglo-American</u> that was--until today, at least--the controlling pre-regulation case.  And <u>Taylor Securities</u> accommodated the Commissioner's need for some point at which he could assess delinquent taxes owed by a foreign corporation that had failed to file its own return.  <u>Taylor Securities</u> and its progeny were precisely the sort of case-by-case development of reasonableness that one would expect in response to the absence of a specific mention of time in section 882.

Where our Opinion leaves the Commissioner after today's ruling is very unclear.[9]  Current IRS practice, even when the Commissioner prepares a substitute return under section 6020(b), is to encourage nonfilers to prepare and file a return, if for no other reason than to stop the addition to tax for failure to timely file.  See sec. 6651(g)(1), (a)(1); <u>In re Rank</u>, 161 B.R. 406 (N.D. Ohio 1993) (noting number of exceptions to recognition of substitute return, giving taxpayer continuing incentive to file); Saltzman, IRS Practice & Procedure, par. 4.02 (citing examples in Code where taxpayer may file a return after substitute return prepared to challenge Commissioner's

---

[9] The majority seems to soften its analysis by suggesting at a couple points that the Commissioner can still enforce section 882 by again preparing substitute returns.  See majority op. pp. 65 note 22, 75.  But the Opinion also states that this cannot be an "absolute and rigid rule."  Majority op. p. 74 note 28.

determinations).  If the majority's hesitance to explicitly
overrule <u>Taylor Securities</u> is an endorsement of what was, over 60
years ago, "the generally accepted rule concerning the number of
returns which may be filed," majority op. p. 75 note 28, quoting
<u>Blenheim</u>, 125 F.2d at 910, it will just cause more confusion
given the intervening evolution in the effect of substitute
returns.

II.

Having concluded that the plain language of section 882
invalidates the regulation, the majority could have stopped.
Instead, as an alternative holding, it goes on to analyze the
reasonableness of the regulation under <u>National Muffler</u>--asking
whether the regulation "(harmonizes with the plain language of
the statute, its origin, and its purpose.)"  Majority op. p. 55
(quoting <u>National Muffler</u>, 440 U.S. at 477).

Applying <u>National Muffler</u>, the majority concludes that the
regulation is out of tune with the statute not just because it
fails to harmonize with section 882's plain language but because
the regulation:

!    is "not a 'substantially contemporaneous
     construction of the statute,'"

!    "merely adopted respondent's unsuccessful
     litigating position,"

!    "conflicts with the agency's previous
     interpretation of the same statute,"

! had been in effect for only a short time before being challenged,

! was not issued after a revision to section 882, and

! was not relied on by petitioner to his detriment.

See majority op. pp. 65-67.

Each of these statements is at least arguably true--though it seems a stretch to say that a bright-line 18-month grace period is so substantially different from the old reasonable-time-before-letting-the-IRS-bring-the-curtain-down-by-filing-a-substitute-return test as to be in "conflict". And each of the factors the majority cites is concededly relevant in a National Muffler analysis. These counts, though, don't add up to a successful indictment of the regulation's reasonableness. For what really seems to trouble the majority is that this regulation was promulgated years after section 882 or its predecessor was enacted, and that it disregarded the caselaw that had built up in the meantime. These related issues are the "legislative reenactment" and "Brand-X" problems.

### A.

According to the majority, the legislative reenactment doctrine means that "Congress is presumed to have known of the administrative and judicial interpretations of a statutory term reenacted without significant change and to have ratified and included that interpretation in the reenacted term." Majority

op. p. 69.  The majority then marches through the history of the reenactments of section 882--both the great codifications of 1939, 1954, and 1986, and a minor amendment (having nothing to do with the filing requirement) in 1966--before reaching its conclusion that Congress "was mindful of the relevant judicial interpretations and included within the reenacted text the judiciary's interpretation."  Majority op. p. 70.

I don't agree that this is right formulation of the legislative reenactment doctrine, at least when it is used to *invalidate*, rather than uphold, a regulation.  In a lengthy discussion of the doctrine, the D.C. Circuit held:

> The district court mistakenly relied on the familiar notion that Congress is presumed to be aware of administrative interpretations of a statute or regulation when it adopts such language in a statute.  Though courts have stated this general proposition, usually as a defense to a later attack against the same interpretation, *no* case has rested on this presumption alone as a basis for holding that the statute required that interpretation.* * *

AFL-CIO v. Brock, 835 F.2d 912, 916 n.6 (D.C. Cir. 1987).

Even if we wanted to be pioneers, I am quite leery of the majority's formulation.  Elsewhere in Brock, the D.C. Circuit summarized its understanding of the doctrine to require "express congressional approval of an administrative interpretation if it is to be viewed as statutorily mandated."  Id. at 915.  Other

appellate courts have likewise been careful in limiting the doctrine:

> **!** "Mere reenactment is insufficient. It must also appear that Congress expressed approval of the agency interpretation. That is to say, the doctrine applies when Congress indicates not only an awareness of the administrative view, but also takes an affirmative step to ratify it." <u>Isaacs v. Bowen</u>, 865 F.2d 468, 473 (2d Cir. 1989);

> **!** "When the congressional discussion preceding reenactment makes no reference to the * * * regulation, and there is no other evidence to suggest that Congress was even aware of the * * * interpretive position[,] 'we consider the * * * reenactment to be without significance.'"* * * <u>Am. Bankers Ins. Grp. v. United States</u>, 408 F.3d 1328, 1335-36 (11th Cir. 2005) (quoting <u>Am. Online v. United States</u>, 64 Fed. Cl. 571, 580-581 (2005)).

See also <u>Peoples Fed. Sav. & Loan Association. of Sidney v. Commissioner</u>, 948 F.2d 289, 302 (9th Cir. 1991) (doctrine is "most useful in situations where there is some indication that Congress noted or considered the regulations in effect at the time of its action").

The majority's reliance on legislative reenactment should have ended when it could find no affirmative evidence that Congress knew of any of the Fourth Circuit or BTA cases that it describes. The legislative history that the majority quotes and summarizes features only vague references to "existing law." Majority op. p. 73.

Of course, the majority also describes at great length the *absence* of even a mention of a timely filing requirement in any of the various legislative histories that it pores through.  They reason that the absence of any disagreement with the existing BTA and Fourth Circuit precedents shows that Congress intended to ratify those precedents.  See majority op. pp. 70-71.  This is an innovation.  If taken seriously, it would freeze existing judicial constructions and IRS regulations in place whenever Congress reenacted a portion of the Code, forcing us to treat them as if they were part of the statutory language and blocking the Secretary from changing regulations without persuading Congress to change the Code.

This cannot be right.

### B.

The majority is, I think, also wrong about the amount of deference the Secretary owes to caselaw when he writes a regulation.

This is the Brand-X problem.  In that case, the FCC had issued a declaratory rule interpreting the term "telecommunications service" under its general authority to enforce the Telecommunications Act of 1934.  Brand X, 125 S. Ct. 2688, 2695 (2005).  According to this new regulation, broadband cable modems were not a "telecommunication service."  This was a change in the law, at least in the Ninth Circuit, because in AT&T Corp. v.

<u>Portland</u>, 216 F.3d 871, 880 (9th Cir. 2000), that court had specifically ruled that broadband cable modems *were* a "telecommunications service."

The Supreme Court began its analysis by citing the FCC's broad grant of regulation-writing power--very similar to the Secretary's in section 7805(a)--of prescribing "such rules and regulations as may be necessary in the public interest." <u>Brand X</u>, 125 S. Ct. at 2699. The Court recognized that the regulation did change existing caselaw but reasoned:

> A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to <u>Chevron</u> deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.* * *

<u>Id.</u> at 2700.

The majority distinguishes <u>Brand X</u> in several ways:

! the FCC gave a more careful consideration of developments in the field than the Secretary did here;

! <u>Brand X</u> did not involve a change in the agency's own interpretation;

! the FCC was not a party in the court case whose holding it was reversing; and

! the FCC's new regulation was promulgated only five years after the contrary caselaw.

Majority op. pp. 78-81.

These distinctions should not make a difference--the Supreme Court did not balance carefulness of consideration, prior litigation history, or the amount of time that had passed between the caselaw and the new regulation.  It simply looked to see if the agency had been delegated broad regulatory authority and whether its construction of an ambiguous statutory phrase was reasonable.  Brand X, 125 S. Ct. at 2700-2702.  Conflicting precedent would have mattered only if that precedent had held the phrase "telecommunications service" to have an unambiguous meaning contrary to the regulation.  Id. at 2700.  And in this case, the majority can point to no precedent that holds the absence of a time restriction in section 882 *unambiguously* means that there is no time restriction.

### III.

Finding the regulation unreasonable under National Muffler, even if section 882 is ambiguous, raises some very difficult issues at the intersection of administrative and tax law.  I think the majority has erred, both in relying so heavily on the disputed regulation's change to existing law and in being so skeptical about whether Brand X even applies to tax regulations, majority op. p. 77.  I also think those errors are examples of how difficult some of these issues have proven to be for trial courts conscientiously trying to follow their reviewing courts' precedents.  In the spirit of Eberhart v. United States, 546 U.S.

___, 126 S. Ct. 403, 407 (2005), revg. 388 F.3d 1043 (7th Cir. 2004), I think it important not to hide these troublesome issues and hope that their effects in this case will help those likely to review our decision.

A.

The first issue is whether it is still correct to say, as we did ten years ago, that

> we are inclined to the view that the impact of the traditional, i.e., National Muffler standard, has not been changed by Chevron, but has merely been restated in a practical two-part test * * *

Central Pa. Sav. Association & Subs. v. Commissioner, 104 T.C. 384, 392 (1995) (quoted at majority op. p. 56).  Both National Muffler and Chevron do tell courts to review regulations for their reasonableness.  But the factors that each test tells us to consider can be quite different.

National Muffler--at least as our Court has applied it-- requires a top-to-bottom review of the regulation to see if it is in harmony with the "plain language of the statute, its origin, and its purpose."  National Muffler, 440 U.S. at 477.  It requires us to consider whether a regulation:

> is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent.  If the regulation dates from a later period, the manner in which it evolved merits inquiry.  Other relevant considerations are the length of

> time the regulation has been in effect,
> the reliance placed on it, the consistency
> of the Commissioner's interpretation, and
> the degree of scrutiny Congress has
> devoted to the regulation during
> subsequent re-enactments of the statute.
> * * *

Id.

National Muffler gives great weight to the consistency of an agency's position over time, consistency with judicial precedent,[10] and any reliance interest the public might have developed. This makes a regulation that changes existing law more likely to be invalidated. And this is logical--if a court has to consider factors focusing on the Secretary's justification for changing his position, there will be some cases where they will be decisive. See, e.g., Pac. First Fed. Sav. Bank v. Commissioner, 94 T.C. 101 (1990) (discussed *supra* note 2).

Chevron review places substantially less emphasis on justification for regulatory change. It expressly recognizes that there can be a range of permissible alternatives, and directs a court to decide only if the agency's regulation is "a permissible construction of the statute." Chevron, 467 U.S. at

---

[10] This seems to be a special concern for our Court. See, e.g., Ga. Fed. Bank v. Commissioner, 98 T.C. 105, 114 (1992) (later vacated and remanded) (regulations contrary to judicial precedents "created a greater inconsistency than they resolved"); Redlark, 106 T.C. at 57 ("The nuts and bolts of this case is that the Commissioner continues to disagree with the pre-TRA judicial view"); see also majority op. p. 63 (deference unwarranted where Secretary has "total disregard to firmly established judicial precedent").

843.  After <u>Chevron</u>, "there is a range of permissible interpretations * * * [and] the agency is free to move from one to another, so long as the most recent interpretation is reasonable its antiquity should make no difference."  <u>Barnhart v. Walton</u>, 535 U.S. 212, 226 (2002) (Scalia, J., concurring in part and concurring in judgment).

It's important to recognize that, in most cases, applying either <u>National Muffler</u> or <u>Chevron</u> will end up producing the same result--when a statute is ambiguous, agencies do have considerable leeway in devising regulations that clarify the law.  But the most important class of cases in which results under the two tests diverge is the one into which this case falls--when an agency writes a regulation that changes existing law, either in the form of a previous regulation or judicial construction.  The Supreme Court has consistently held that <u>Chevron</u> allows such reversals.[11]  <u>Chevron</u> is such an important case because it was so explicit in recognizing that resolution of ambiguities in a

---

[11] See, e.g., <u>Brand X</u>, 545 U.S. ___, 125 S. Ct. at 2699 (2005) (agency reversal permissible as it is charged with interpreting ambiguous statutes); <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517 U.S. 735, 742 (1996) (prior contradictory agency position is not fatal); <u>Rust v. Sullivan</u>, 500 U.S. 173, 186-187 (1991) (changing circumstances require that an agency's position not be "carved in stone").  Of course, such changes are permissible under <u>National Muffler</u> too.  (Indeed, <u>National Muffler</u> involved a regulation that changed existing law.  440 U.S. at 481-483.)  But they would seem to be less probable because of the <u>National Muffler</u> factors that concentrate on consistency in the law over time.

statute is more "a question of policy than of law. * * * When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696 (1991).

We have, in some cases at least, viewed the decision to analyze a regulation under National Muffler as a mandate to undertake a review of the Secretary's legal analysis, construing "reasonableness" under National Muffler almost as meaning "the most reasonable construction." Compare the majority's analysis in today's Opinion to the minimal deference given regulations under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944): "The weight * * * in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control."

This "hard look" deference simply doesn't reflect the contemporary understanding of administrative law that regulations are a way to make policy choices, not just a way to interpret ambiguous statutory phrases. I agree with the majority that the judicial interpretations of section 882(c)(2) in the years before

the regulation was issued are more in keeping with the actual words of the Code than are the words of the regulation.  But this is due to the different competencies of judges and regulation writers.  Regulation writers are doing their jobs when they make up safe harbors and lay down deadlines; for judges to do so-- instead of setting up fact-bound tests of "reasonableness"--looks like an exercise of legislative or administrative, rather than judicial, power.

My disagreement with the majority is not just a disagreement about how to apply National Muffler.  Instead, I think the problem lies in a very subtle distinction between National Muffler and Chevron--"reasonableness" using the National Muffler factors is taken to mean "is the Secretary construing the statute reasonably?," while under Chevron it means "is the Secretary behaving unreasonably by violating the statute in the course of exercising his delegated authority to set policy?"  Both cases look to reasonableness,[12] but in different ways.  The majority's condemnation of the Secretary's 18-month grace period, majority

---

[12] The Supreme Court's continuing citations to National Muffler after Chevron all stand for this general proposition. See Boeing Co. v. United States, 537 U.S. 437, 451 (2003); United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 219 (2001);  Atl. Mut. Ins. Co. v. Commissioner, 523 U.S. 382, 389 (1998); Commissioner v. Estate of Hubert, 520 U.S. 93, 127 (1997); Newark Morning Ledger Co. v. United States, 507 U.S. 546, 576 (1993); Cottage Sav. Assn. v. Commissioner, 499 U.S. 554, 560-561 (1991).

op. p. 62 note 17, illustrates this.  It rhetorically asks: "Where that * * * rule came from, we do not know."  Majority op. p. 62 note 17.  The fact is that the Secretary routinely makes tax law more certain by using his regulatory authority under section 7805(a) to dredge safe harbors and stake well-defined boundaries.  See, e.g., sec, 1.401(a)(4)-2(b) Income Tax Regs. There are undoubtedly hundreds more such instances scattered throughout the five thick volumes of title 26 of the Code of Federal Regulations.  They (or at least most of them) survive Chevron review because they are "permissible constructions" in the sense that they don't violate the Code, not in the sense that they interpret the Code in the same way a judge using normal canons of statutory interpretation would.  If each of these detailed regulations had to survive scrutiny by matching it up against general statutory language and asking "where did this come from?," instead of "does the Code prohibit it?" today's Opinion would ignite a thoroughgoing revolution in tax law.

B.

This observation brings me to the next two issues today's decision raises--should regulations issued under section 7805(a) receive Chevron deference?  And what would such deference look like?

The key text here is the famous passage from Chevron where the Supreme Court said:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

467 U.S. at 843-44 (fn. refs. omitted).

What is an "express delegation of authority to the agency to elucidate a specific provision of the statute by regulation?" And what is the difference between reviewing a regulation to decide whether it is "arbitrary, capricious, or manifestly contrary to the statute" in contrast to a "reasonable interpretation?"

I'll discuss each in turn.

1.

The majority accurately states our Court's general rule - if the Secretary issues a regulation under section 7805(a), we call it "interpretive" and analyze its validity under <u>National Muffler</u>, but if the Secretary issues a regulation under a more specific grant of authority, we call it "legislative," and analyze its validity under <u>Chevron</u>. <u>Walton v. Commissioner</u>, 115 T.C. 589, 597 (2002).

Understanding the problem this causes requires a brief introduction into the ambiguity of the terms "interpretive" and "legislative" when used to describe regulations. In tax law, "legislative" regulations are those issued by the Secretary under a specific grant of authority in a particular Code section. "Interpretive" regulations, on the other hand, are all those regulations issued under the Secretary's general authority to prescribe all "needful rules and regulations." See sec. 7805(a). "Interpretive" regulations issued under sec. 7805(a) are, however, almost always sent through notice-and-comment rulemaking.[13]

In administrative law, these same terms mean something different. Under the Administrative Procedure Act, "legislative regulations" are those that create new legal duties binding on the parties and the courts. Merrill & Watts, Agency Rules With the Force of Law: The Original Convention, 116 Harv. L. Rev. 467, 477 (2002). They must generally be subjected to notice-and-comment rulemaking. 5 U.S.C. sec. 553(b) (2000). "Interpretative" regulations, in contrast, only clarify existing

---

[13] Saltzman, IRS Practice & Procedure, 2d ed., par. 3.02[2]; sec. 601.601, Statement of Procedural Rules.

duties; and they do not bind the public, and do not go through notice-and-comment rulemaking.[14]

There can be little doubt that, in this classification, both general and specific authority tax regulations are intended to bind the public and have the force of law. The IRS and Treasury use the same regulation-writing process for both general and specific authority regulations, subjecting both to the same painstaking review under the IRS's "Regulation Drafting Handbook," I.R.M. 32.1.5. Both types are issued as Treasury decisions, and both are signed by an Assistant Treasury Secretary and the IRS Commissioner. And when the Code penalizes taxpayers for "disregard of rules and regulations," sec. 6662, it penalizes them for disregard of either type of regulation. See sec. 1.6662-3(b)(2), Income Tax Regs.

Chevron's distinction between explicit and implicit congressional delegations of authority certainly doesn't reflect any difference between general and specific authority regulations. The Court there cited to four cases as examples of

---

[14] The confusing nomenclature prompted one academic to propose calling Treasury regulations issued under section 7805 "general authority" regulations, and Treasury regulations issued under other sections "specific authority" regulations. Coverdale, "Court Review of Tax Regulations and Revenue Rulings in the Chevron Era," 64 Geo. Wash. L. Rev. 35, 55 (1995). I adopt this convention for the remainder of this Opinion.

"express delegations."  <u>Chevron</u>, 467 U.S. at 844 n.12.  But look at the statutes involved

- **!**  42 U.S.C. § 607(a): whether a child "has been deprived of parental support or care by reason of the unemployment (as determined in accordance with standards prescribed by the Secretary)," <u>Batterton v. Francis</u>, 432 U.S. 416, 419 (1977);

- **!**  42 U.S.C. § 1396a(a)(17)(B):  "taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant," <u>Schweiker v. Gray Panthers</u>, 453 U.S. 34, 43-44 (1981);

- **!**  Communications Act of 1934, § 200:  "The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda," <u>AT&T v. United States</u>, 299 U.S. 232, 235 (1936); and

- **!**  25 U.S.C. § 9: "The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs," <u>Morton v. Ruiz</u>, 415 U.S. 199, 231 n.25 (1974).

The first two delegations are the kind that tax lawyers would say lead to "legislative" regulations--they are delegations of authority to fill in a gap in one particular section of a statute.  But the second two delegations are entirely as broad as section 7805(a)'s power to make "all needful rules and regulations under this title."

To make the contrast sharper, consider the two cases cited by the Court in <u>Chevron</u> as examples of a "legislative delegation

to an agency on a particular question [that] is implicit rather than explicit"

> **!** <u>INS v. Jong Ha Wang</u>, 450 U.S. 139, 140 (1981), analyzing reviewability of the Attorney General's decision to suspend deportation of an illegal alien under 8 U.S.C. § 1254(a)(1) if it would "result in extreme hardship * * *," and

> **!** <u>Train v. NRDC</u>, 421 U.S. 60, 67 (1975) analyzing reviewability of the EPA Administrator's approval of a state's Clean Air Act plan under 42 U.S.C. § 1857c(5)(a)(2) requiring him to approve a plan "if he determines that it was adopted after reasonable notice and hearing."

Neither of these two cases involved direct review of regulations at all, but instead were reviews of individual decisions by agencies in the course of which they had to construe disputed statutory terms.

In short, I think that the contrast that <u>Chevron</u> made was between review of regulations put through notice-and-comment rulemaking, and construction of statutory terms in the course of administrative adjudication.[15]  Reading <u>Chevron</u> this way makes sense when one considers the Administrative Procedure Act itself, which tells courts to use one standard in reviewing formal regulations--are they "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?," 5 U.S.C. § 706(2)(A), see <u>Motor Vehicle Manufacturers Association of</u>

---

[15] This is the consensus view in nontax fields.  See Cunningham & Repetti, "Textualism and Tax Shelters," 24 Va. Tax Rev. 1, 43-45 (2004).

United States, Inc. v. State Farm, 463 U.S. 29, 41-45 (1983); and another standard in reviewing administrative adjudications--are they "unsupported by substantial evidence?," 5 U.S.C. § 706(2)(E) (which has been interpreted as going to "the *reasonableness* of what the agency did," United States v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963) (emphasis added)).

Mead makes this clearer--it says that the Court has "recognized a very good indicator of delegation meriting Chevron treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations."  533 U.S. at 229 (2001).  It then lists, among other cases to prove that point, Atlantic Mut. Ins. Co v. Commissioner, 523 U.S. 382 (1998), a case in which we were reversed after invalidating a regulation issued under section 7805(a).[16]

---

[16] Mead, 533 U.S. at 230 n.12.  Many, perhaps most, of the cases cited in that footnote involve general authority regulations.  E.g. Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1 (2000)[issued under 42 U.S.C. sec. 1395cc(b)(2) ("Secretary may [act] * * * as may be specified in regulations")]; United States v. Haggar Apparel Co., 526 U.S. 380 (1999)[issued under 19 U.S.C. sec. 1502(a) (Secretary may "establish and promulgate such rules and regulations not inconsistent with the law")]; AT&T Corp. v. Ia. Util. Bd., 525 U.S. 366 (1999)[issued under 47 U.S.C. sec. 201(b) ("Commissioner may prescribe such rules and regulations as may be necessary")]; United States v. O'Hagan, 521 U.S. 642 (1997)[issued under 15 U.S.C. sec. 78j(b) (authorizing "rules and regulations as the [SEC] Commissioner may prescribe as necessary or appropriate")]; Am. Hospital Assn. v. NLRB, 499 U.S. 606 (1991)[issued under 29
(continued...)

After Mead, I don't think it possible to draw distinctions between the deference owed tax regulations issued under section 7805(a) and those issued under more specific authority.[17] See Boeing Co. v. United States, 537 U.S. 437, 448 (2003) (dismissing dispute over distinctions between general and specific authority regulations because both must be treated with deference).

If applying Chevron instead of National Muffler would lead to a different result, this discussion might still not matter-- National Muffler (and the pre-Chevron cases that relied on it, United States v. Vogel Fertilizer Co., 455 U.S. 16 (1982); Rowan Cos. v. United States, 452 U.S. 247 (1981) were all tax cases,

---

[16](...continued) U.S.C. sec. 156 ("authority from time to time to make, amend, and rescind * * * such rules and regulations as may be necessary")]; Sullivan v. Everhart, 494 U.S. 83 (1990)[issued under 42 U.S.C.(a) 401 et seq. (Secretary authorized to "make rules and regulations and to establish procedures not inconsistent with this subchapter, which are necessary")]; Massachusetts v. Morash, 490 U.S. 107 (1989)[issued under 29 U.S.C. sec. 1135 ("the Secretary may prescribe such regulations as he finds necessary or appropriate")]; K Mart Corp. v. Cartier, Inc., 486 U.S. 281 (1988)[issued under 19 U.S.C. sec. 1526(d)(4) ("Secretary may prescribe such rules and regulations as may be necessary")].

[17] See also Vermuele, "Mead in the Trenches," 71 Geo. Wash. L. Rev. 347, 350 (2003) (notice-and-comment rulemaking a safe-harbor category); but see Coke v. Long Island Care at Home, Ltd., 376 F.3d 118, 132 n.5 (2d Cir. 2004); Merrill, "The Mead Doctrine: Rules and Standards, Meta-Rules, and Meta-Standards," 54 Admin. L. Rev. 807, 814-15 (2002) (notice-and-comment rulemaking begets Chevron deference only if regulation intended to have force of law). (That distinction wouldn't matter here, because general authority tax regulations are intended to have the force of law.)

and the rule is that we are bound to follow the cases that more directly control until and unless they are expressly overruled. Agostini v. Felton, 521 U.S. 203 (1997), quoted by Eberhart, 388 F.3d at 1049.

But our Court has a special problem in trying to find the precedents it should follow--appeals from our decisions go to twelve different courts of appeal, and the question of what review a general authority regulation issued under section 7805 should get has already led to divergent results. Some of our reviewing courts have concluded that general authority regulations don't qualify for Chevron deference, and some have concluded that they qualify only as an implicit delegation on a particular question and read Chevron as silently incorporating National Muffler and its factors as a test of "reasonableness." And some read Chevron as requiring review of general authority regulations under an arbitrary-and-capricious standard.

The resulting circuit split was noted as long ago as 1998. See Bankers Life and Casualty Co. v. United States, 142 F.3d 973, 982 (7th Cir. 1998). And it seems only to have become more pronounced:

!   Second Circuit--Gen. Elec. Co. v. Commissioner, 245 F.3d 149, 154 n.8 (2001) (noting conflict but not taking sides)

!   Third Circuit--E.I. du Pont de Nemours & Co. v. Commissioner, 41 F.3d 130, 135-36 and n.23 (1994) (less deference to general authority regulations,

but leaving open possibility of considering the question); see also the nontax cases <u>Cleary v. Waldman</u>, 167 F.3d 801, 807 (1999) (<u>Chevron</u> deference applies to notice-and-comment rules); <u>Elizabeth Blackwell Health Center for Women v. Knoll</u>, 61 F.3d 170, 190 (1995) (interpretive rules get only <u>Skidmore</u> deference);

! Fourth Circuit--<u>Snowa v. Commissioner</u>, 123 F.3d 190, 197 (1997) (general authority regulations get <u>National Muffler</u> review under <u>Chevron</u>);

! Fifth Circuit--<u>Nalle v. Commissioner</u>, 997 F.2d 1134, 1138 (1993) (<u>National Muffler</u> review rather than <u>Chevron</u>);

! Sixth Circuit--<u>Peoples Fed. Sav. & Loan Association. of Sidney v. Commissioner</u>, 948 F.2d 289, 300 (1991) (<u>Chevron</u> review for "reasonableness"); <u>Hospital Corp. of Am. & Subs. v. Commissioner</u>, 348 F.3d 136, 141 (2004);

! Seventh Circuit--<u>Bankers Life & Cas. Co. v. United States</u>, 142 F.3d 973, 983 (1998) (<u>Chevron</u> review for "reasonableness");

! Eighth Circuit--<u>United States v. Tucker</u>, 217 F.3d 960, 965 (2000) (<u>National Muffler</u> review)

! Ninth Circuit--<u>Redlark v. Commissioner</u>, 141 F.3d 936, 940 (1998) (<u>Chevron</u> arbitrary-and-capricious review);

! Tenth Circuit--<u>In re Craddock</u>, 149 F.3d 1249, 1258 (1998) (<u>National Muffler</u> review)

! Eleventh Circuit--<u>Beard v. United States</u>, 992 F.2d 1516, 1520-21 (1993) (<u>Chevron</u> arbitrary-and-capricious review);

! D.C. Circuit--<u>Tax Analysts v. Commissioner</u>, 350 F.3d 100, 102-03 (2003) (<u>Chevron</u> review); and

! Fed. Circuit--<u>Schuler Indus. Inc. v. United States</u>, 109 F.3d 753, 755 (1997) (<u>National Muffler</u> deference)

2.

How would review of this regulation look under <u>Chevron</u>?

Here again, I think that <u>Mead</u> has clarified the law, by conflating the standard of "reasonableness" with the standard of "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See <u>Mead</u>, 533 U.S. at 229.[18]

On what "reasonableness" means in the post-<u>Mead</u> world, I generally agree with Judges Swift and Halpern.[19] The question is one of line-drawing, and substituting an 18-month rule for an indeterminate and case-by-case consideration of the facts certainly seems reasonable. It does nothing more than substitute more definite deadlines for less definite ones and allows the Commissioner to trigger them by sending a notice rather than filing a substitute return.

---

[18] See also Sunstein, Law and Administration after *Chevron*, 90 Colum. L. Rev. 2071, 2093 (1990) ("<u>Chevron</u> might be taken to suggest that whenever an agency is entrusted with implementing power--whether to be exercised through rulemaking or adjudication--agency interpretations in the course of exercising that power are entitled to respect so long as they are reasonable"). See also <u>CHW West Bay v. Thompson</u>, 246 F.3d 1218, 1223 (9th Cir. 2001) (summarizing caselaw on <u>Chevron</u> step two as requiring reasonableness in substantive interpretation and in the process of making the decision).

[19] There is an extensive commentary on <u>Chevron</u> step-two standards. See Polsky, "Can Treasury Overrule the Supreme Court?," 84 B.U.L. Rev. 185, 192 (2004); Cunningham & Repetti, *supra* n.15, 24 Va. Tax Rev. at 49.

I will only add a cite to <u>Motor Vehicle Mfrs. Assn. of the United States, Inc. v. State Farm</u>, 463 U.S. 29 (1983). In that case, the Supreme Court wrote that a regulation was arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.* * *

<u>Id.</u> at 43; see also Sunstein, 90 Colum. L. Rev. at 2104-2105.

That is of course far from what happened here. The Secretary faced an ambiguous phrase in a Code section, unambiguously aimed at giving foreign corporations a major incentive to file their returns. He also learned by experience that some taxpayers would wait to file until a notice of deficiency was issued, <u>Anglo-American</u>, 38 B.T.A. 711, or would file only after starting a case in this Court, <u>Blenheim</u>, 125 F.2d 906, or would refuse to file even after a revenue agent came calling, <u>Ardbern</u>, 120 F.2d 424. To issue a regulation with a fixed grace period and provision for exceptions reflected experience, failed to consider no aspect of the problem, and ran counter to no reasonable evidence before him. The regulation did change existing law, but under <u>Chevron</u> and <u>Brand-X</u>, the Secretary should be allowed to "change the law"--even if the law is our

caselaw--by regulation, vetted by notice-and-comment, and tested against only a very liberal notion of reasonableness.

I respectfully dissent.

Swift, J., agrees with this dissenting opinion.